IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MINDI LARUE and JEREMY TUCKER, husband and wife,
*Plaintiffs/Appellees,*

*v.*

DAVID BROWN and SARAH BROWN, husband and wife,
*Defendants/Appellants.*

No. 1 CA-CV 13-0138
FILED 08-19-2014

Appeal from the Superior Court in Maricopa County
No. CV2009-039582
The Honorable Katherine M. Cooper, Judge

**AFFIRMED**

COUNSEL

Curry Pearson & Wooten PLLC, Phoenix
By Michael W. Pearson and Kyle B. Sherman
*Counsel for Plaintiffs/Appellees*

Jaburg & Wilk PC, Phoenix
By Kraig J. Marton and Laura Rogal
*Counsel for Defendants/Appellants*

**OPINION**

Presiding Judge Andrew W. Gould delivered the opinion of the Court, in which Judge Peter B. Swann and Judge Jon W. Thompson joined.

**G O U L D**, Judge:

¶1        David and Sarah Brown ("Defendants") appeal from a judgment entered against them after a jury found them liable for defaming Mindi Larue and Jeremy Tucker ("Plaintiffs") on the Internet.  Defendants argue Plaintiffs' defamation claim was barred by the statute of limitations because they filed it more than one year after the defamatory statements were published.  We conclude, however, that Plaintiffs' defamation action was not time-barred because Defendants republished the statements less than one year before Plaintiffs filed their claim.  We therefore affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        David Brown and Mindi Larue are former spouses who divorced in 2006.  During the marriage, David and Mindi had two children.  After the divorce, David married Sarah, and Mindi married Jeremy Tucker.

¶3        David and Mindi's divorce was very contentious, and resulted in a protracted custody battle over the children.  In mid-2007 Defendants initiated a criminal investigation based on allegations Jeremy had abused one of the children.  Defendants also filed an emergency petition to modify custody and parenting time in the family court.  In March 2008, after a hearing on the petition to modify, the family court determined the allegations of abuse were not proven by a preponderance of the evidence.

¶4        On November 20 and 22, 2008, Sarah posted two articles on the website www.ripoffreport.com in which she accused Plaintiffs of sexual and criminal misconduct.  Both articles revealed Plaintiffs' names, phone numbers, and address.  The November 20 article is entitled, "Mindi Larue [f]. n. a. Mindi Brown allowed physical abuse of daughter and protected boyfriend when daughter reported sexual abuse Phoenix Arizona."  The article stated that "Mindi Larue is a despicable 'mother,'" and that "her live in boyfriend, Jeremy Tucker, molested and tortured her 4 year old daughter."  The article notes that despite the child's statement to the police in Wisconsin about the abuse, no charges were filed, and as a result the child is "once again back in the home of the same man who tortured her" and sexually abused her.  The article lists Jeremy Tucker's employer, and warns the reader that he "could be working at your business or company, or on nearby building projects.  BEWARE."

¶5        The November 22 article is entitled, "Jeremy Tucker Child Molestor (sic), also tortures children with Tobasco sauce Phoenix Arizona."

It alleged that "Jeremy Tucker is a sick sick pedophile who molested and tortured his girl friends (sic) 4 year old daughter," "touched her privates," and put "tobasco sauce in her panties." The article stated that charges were not filed and "this poor child is once again back in the home of the same man who tortured her with Tabasco sauce and touched her privates."

¶6        The website provided for interaction between readers and authors through a report and rebuttal forum which allowed interested readers to post questions and comments. On February 1, 2009, a reader posted a comment on the November 22 article entitled, "Where is the Little Girl's Biological Father? Where are her grandparents?" The reader then posed a series of questions, including, "Why hasn't the little girl said something to her father," and "Why hasn't someone called the child abuse hotline and reported this?"

¶7        On March 9, 2009, in response to the reader's comment, Sarah posted a statement on the November 20 article entitled "Answer to the WHY's." In this article, Sarah noted that the child did report the abuse to her biological father and the incident was reported to the police. Sarah then recited additional details of the child's interview with the police, and discussed the subsequent investigations conducted by CPS and the Arizona Ombudsman's Office. Sarah also stated that Jeremy Tucker "REFUSED (sic) to take a polygraph test on this matter." Sarah concluded that the case had been mishandled by CPS, "and as a result the child is now back in the home of the same man she was brave enough to speak against."

¶8        On June 1, 2009, a reader posted a comment on the November 22 article entitled, "What proof do you have?" In this comment, the reader stated "This is a 100% fake! I know this family very well and I also know the person who mailed this story to my whole neighborhood…He is just trying to get back at his ex-wife."

¶9        Later, on June 5, 2009, Defendants posted a response to a reader's comment and a "reply to everyone" on the November 22 article. In the response Defendants allege, "If you want proof of the fact that this man refused to take a polygraph test then look up PUBLIC records case [police report number]." Defendants then state "There is a substantial amount of proof," "do your research on child sexual abuse before you pipe off at the mouth while not having any evidence in front of you…" Then, on June 7, Defendants posted another comment on the November 22 article entitled, "reply to everyone." The reply stated, in part, "I am the biological father," and "I read the reply accusing me of seeking retribution. Who ever (sic) wrote that is a liar."

¶10    On December 23, 2009, Plaintiffs sued Defendants alleging the articles published by Defendants on the Internet were defamatory.

¶11    Defendants filed several motions to dismiss Plaintiffs' complaint on the grounds it was barred by the statute of limitations. The court denied all of Defendants' motions, and the case went to trial.

¶12    At the close of the evidence, Defendants asked the court to instruct the jury on their statute of limitations defense. Defendants sought language instructing the jury that it could not consider statements "made before December 23, 2008." The court did not include the requested language; instead, the court gave the following instruction:

> The statute of limitations for a defamation claim is one (1) year from the date the alleged defamatory statement was published to a third person. If a statement is re-published at a later date, the statute of limitations starts to run from the date of the republication. The lawsuit in this case was filed December 23, 2009. A statement is republished if it is published in a modified form.

¶13    The jury found Defendants liable for defamation. The jury awarded Plaintiffs $150,000.00 in compensatory damages against both Defendants and $50,000.00 in punitive damages against Sarah Brown.

## DISCUSSION

¶14    The only issue on appeal is whether the court erred in refusing to grant Defendants relief on their statute of limitations defense. The parties list a number of standards of review applicable to the various procedural mechanisms employed by Defendants to raise their statute of limitations defense. However, all of the issues raised on appeal concern questions of law. "We review de novo questions of law concerning the statute of limitations, including 'when a particular cause of action accrues'" regardless of the means by which the issue was put before the court. *Cook v. Town of Pinetop-Lakeside*, 232 Ariz. 173, 175, ¶ 10, 303 P.3d 67, 69 (App. 2013).

¶15    Generally, Arizona provides that the statute of limitations for a defamation action begins to run upon publication of the defamatory statement. *Boatman v. Samaritan Health Servs., Inc.*, 168 Ariz. 207, 213, 812 P.2d 1025, 1031 (App. 1990) (citing *Lim v. Superior Court in and for Pima Cnty.*, 126 Ariz. 481, 482, 616 P.2d 941, 942 (App. 1980)). A plaintiff has one year after a defamation action accrues to commence and prosecute his claim.

Arizona Revised Statutes ("A.R.S.") § 12-541(1) (West 2014); *Glaze v. Marcus*, 151 Ariz. 538, 540, 729 P.2d 342, 344 (App. 1986). This appeal raises two issues of first impression in Arizona regarding the accrual date of a cause of action for defamation: (1) whether the single publication rule applies to defamatory statements published on the Internet, and (2) what constitutes a republication of a statement posted on the Internet.

I.      Discovery Rule

**¶16**      Plaintiffs assert that the statute of limitations does not bar their defamation claim because they did not know who wrote the articles when they were posted in November 2008. Plaintiffs contend they did not learn that Defendants posted the articles until sometime later in 2009. Thus, based on the "discovery rule," Plaintiffs argue their cause of action did not accrue until they learned that Defendants authored the articles. *See Wyckoff v. Mogollon Health Ins.*, 232 Ariz. 588, 591, ¶ 9, 307 P.3d 1015, 1018 (App. 2013) (stating that the "discovery rule" allows a cause of action to accrue "when the plaintiff knew or by the exercise of reasonable diligence should have known of the defendants' conduct," rather than at the time of the injury).

**¶17**      The discovery rule does not apply to this case. The record shows that Plaintiffs were aware of the articles, and were convinced Defendants had published them, as early as November 24, 2008. They cannot now assert the statements, or their author, were concealed from them. *See Phillips v. World Publ'g Co.*, 822 F. Supp. 2d 1114, 1122 (W.D. Wash. 2011) (stating that a plaintiff cannot seek application of the discovery rule where pleadings indicate his knowledge of the statements).

II.      The Single Publication Rule and Republication

**¶18**      Plaintiffs argue that Defendants' posts in March and June of 2009 were substantive modifications of the original articles posted in November 2008. As a result, Plaintiffs contend the later posts were republications that fell outside the single publication rule, thereby starting the accrual date for their defamation action anew.

A.      Single Publication Rule

**¶19**      The single publication rule controls the point from which a defamation action accrues and when the statute of limitations begins to run. Under this rule, a cause of action for defamation arises at the time the statement is first published; later circulation of the original publication does not start the statute of limitations anew, nor does it give rise to a new cause

of action. *Phillips*, 822 F. Supp. 2d at 1122 (holding that under the single publication rule, any one edition of a book or newspaper or similar aggregate publication is treated as a single publication and "can give rise to only one cause of action" (citing *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1130 (9th Cir. 2006))); *Firth v. State*, 775 N.E.2d 463, 464-65 (N.Y. 2002) (stating that under the single publication rule, even though many copies of a defamatory publication may be widely distributed, the publication is given the legal effect of one act and gives rise to one cause of action).

¶20 Arizona has enacted the single publication rule by adopting the Uniform Single Publication Act, which provides:

> No person shall have more than one cause of action for damages for libel, slander, invasion of privacy or any other tort founded upon a single publication, exhibition or utterance, such as any one edition of a newspaper, book or magazine, any one presentation to an audience, any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

A.R.S. § 12-651(A).

¶21 The single publication rule protects defendants from being sued separately for each copy of a book or newspaper containing the allegedly defamatory statement. *Oja*, 440 F.3d at 1130-32 ("The single publication rule is designed to protect defendants from harassment through multiple suits and to reduce the drain of libel cases on judicial resources." (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1984))). It also prevents the statute of limitations from being reset each time a copy of a publication is purchased or read. *See Traditional Cat Ass'n, Inc. v. Gilbreath*, 13 Cal. Rptr. 3d 353, 354-55 (Cal. Ct. App. 2004) (applying Uniform Single Publication Act).

¶22 The policy concerns behind the single publication rule apply with equal or more force to Internet publication.

> Given that "[c]ommunications posted on Web sites may be viewed by thousands, if not millions, over an expansive geographic area for an indefinite period of time," allowing Internet publications to be subject to a multiple publication rule "would implicate an even greater potential for endless retriggering of the statute of limitations, multiplicity of suits

and harassment of defendants. Inevitably, there would be a serious inhibitory effect on the open, pervasive dissemination of information and ideas over the Internet, which is, of course, its greatest beneficial promise."

*Oja*, 440 F.3d at 1131-32 (internal citations omitted). Recognizing these policy concerns, federal and state courts have uniformly applied the single publication rule to the Internet. *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615 (7th Cir. 2013) (recognizing that "[e]very state court that has considered the question applies the single-publication rule to information online"); *Atkinson v. McLaughlin*, 462 F. Supp. 2d 1038, 1051-52 & n.3 (D.N.D. 2006) (stating that "other jurisdictions are nearly unanimous in holding that the single publication rule applies in defamation actions arising out of [I]nternet publications").

**¶23** We agree with this reasoning from these other jurisdictions and conclude the single publication rule applies to Internet publications. Thus, in the case of Internet publications, the statute of limitations begins to run when the allegedly defamatory material is first made available to the public by posting it on a website.

**¶24** In this case, Defendants published the defamatory statements on the website on November 20, 2008 and November 22, 2008, which is more than one year before Plaintiffs filed their complaint on December 23, 2009. As a result, unless Defendants republished the statements after December 23, 2008, Plaintiffs' claims are barred by the statute of limitations.

### B. Republication

**¶25** Generally, republishing material in a new edition, editing and republishing it, or placing it in a new form is a separate publication giving rise to a separate cause of action. Restatement (Second) of Torts § 577(A) cmt. d (1977). Republication "occurs when a defamatory article is placed in a new form (paperback as opposed to hardcover) or edited in a new form." *Mitan v. Davis*, 243 F. Supp. 2d 719, 722 (W.D. Ky. 2003); *see also Gilbreath*, 13 Cal. Rptr. 3d at 359 (stating that "a *new edition* of a book or newspaper constitutes a new publication") (emphasis in original). A plaintiff has a new cause of action when "the defendant edits and retransmits the defamatory material, or distributes the defamatory material for a second time with the goal of reaching a new audience." *In re Davis*, 347 B.R. 607, 611 (W.D. Ky. 2006) ("*Davis II*").

**¶26** Because websites are subject to updates or modifications at any time that can be completely unrelated to their substantive content, the

question of republication in the context of Internet publication focuses on whether the update or modification affects the substance of the allegedly defamatory material. *Atkinson*, 462 F. Supp. 2d at 1054-55; *In re Davis*, 334 B.R. 874, 883 (Bankr. W.D. Ky. 2005) ("*Davis I*"); *see also Firth*, 98 N.Y.2d at 371 (stating that posting of an unrelated report to a website hosting the allegedly defamatory statement did not constitute republication). "[M]ere modifications to the *way* information is accessed, as opposed to changes in the nature of the information itself, does not constitute republication." *Davis I*, 334 B.R. at 883; *see also Yeager v. Bowlin*, 693 F. 3d 1076, 1082 (9th Cir. 2012) (holding that "a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience").

¶27        Thus, republication does not occur every time a defendant adds to or revises the content of the website if the changes are unrelated to the alleged defamatory material. In *Churchill v. State*, 378 N.J. Super. 471, 876 A.2d 311 (App. Div. 2005), the New Jersey appellate court concluded that changes to a website hosting a defamatory statement, such as moving and highlighting the website menu bar, did not constitute republications of the statement. *Churchill, id.* at 315, 319. Rather, the court concluded that the changes were technical, altering the means by which readers accessed the defamatory report, but not altering the substance or form of the report. *Churchill, id.* at 319. Similarly, in *Atkinson*, the court concluded a website modification adding information unrelated to the defamatory statement was not a republication; the "modification did not change the content or substance of the website" and the update "did not reasonably result in communicating the alleged defamatory information to a new audience." *Atkinson*, 462 F. Supp. 2d at 1055. And in *Firth*, the court recognized that although websites constantly change through the addition of new material, the changes are not republications unless they relate to and substantively modify the allegedly defamatory material. *Firth*, 98 N.Y.2d at 371-72.

¶28        In contrast, the updates to the defamatory material in this case were not simply technical changes to the website or the addition of new, unrelated material. The facts before us more closely resemble those of *Davis I*. 334 B.R. at 884. In *Davis I*, the website was created by the defendants to document the purportedly criminal and unethical activities of the plaintiff. *Id.* After the initial posting, the defendants made changes to the website by "adding 'Breaking News!' and 'Update!' sections and other sections containing additional substantive information and links to other websites containing substantive information." *Id.* The court concluded that the changes to the website were republications because they "relate[d] to the

original allegedly defamatory material" and they "altered both the substance and the form of the original material." *Id.*

¶29  Here, in March and June 2009, Defendants replied to readers' comments made in response to their original defamatory articles. Defendants' "updates and rebuttals" were posted immediately below the text of the original articles, and the content of Defendants' replies referred to and re-alleged the substance of the original articles. Defendants' later comments also added to and altered the substance of the original material by providing additional information in response to a reader's questions, and re-urging the truth of the original articles in response to another reader's criticism. The Defendants' comments also altered the form of the original articles. The comments were displayed directly beneath the original articles, thereby implying they were supplements to the original articles. In addition, the submission dates of the new comments reflect the date the comments were added (March and June 2009), again implying they were updating the original articles.

¶30  Thus, Defendants republished the defamatory statements originally posted in November 2008 by replying to readers' comments in March and June of 2009. Accordingly, Plaintiffs' cause of action for defamation was not barred by the statute of limitations.

## CONCLUSION

**¶31** For the reasons discussed above, we affirm the judgment. Additionally, because Defendants have not prevailed in this appeal we decline Defendants' request that we asses fees against Plaintiffs pursuant to Arizona Rule of Civil Procedure 11 and A.R.S. § 12-349.



**Ruth A. Willingham** · Clerk of the Court
FILED: gsh