NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5214-14T4

PETRO-LUBRICANT TESTING
LABORATORIES, INC., and
JOHN WINTERMUTE,

     Plaintiffs-Appellants/
     Cross-Respondents,

v.

ASHER ADELMAN, d/b/a
eBossWatch.com,

     Defendant-Respondent/
     Cross-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| October 19, 2016 |
| APPELLATE DIVISION |

Argued September 19, 2016 — Decided October 19, 2016

Before Judges Sabatino, Haas, and Currier.

On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Docket No. L-0406-12.

Mark G. Clark (Traverse Legal) of the Michigan bar, admitted pro hac vice, argued the cause for appellants/cross-respondents (Trimboli & Prusinowski, LLC, and Mr. Clark, attorneys; James Prusinowski, of counsel; Mr. Clark, Mr. Prusinowski, Jinkal Pujara, and John P. Harrington, on the briefs).

Garen Meguerian argued the cause for respondent/cross-appellant.

Eugene Volokh (First Amendment Clinic) of the California bar, admitted pro hac vice, argued the cause for amicus curiae Reporters Committee for Freedom of the Press (Hartman

& Winnicki, P.C., and Mr. Volokh, attorneys; Mr. Volokh and Daniel L. Schmutter, on the brief).

The opinion of the court was delivered by

CURRIER, J.A.D.

In this defamation case, we are asked to decide whether a second posting of an article on a website with minor changes from the original posting was sufficient to categorize it as a separate publication, and therefore subject to a new statute of limitations. We find the minor changes between the two articles to be immaterial and not sufficient to render them two separate publications. In addition, to the extent that any of the changes could be regarded as material, on the whole they lessened the "sting" of the publication. Therefore, the single publication rule is applicable and the complaint was properly dismissed as untimely under the one-year statute of limitations.

We also uphold the dismissal of defendant's counterclaim, rejecting the novel theory that defendant has standing as a publisher to assert a claim of retaliation under the New Jersey Law Against Discrimination (NJLAD).

The website eBossWatch.com was created by defendant Asher Adelman for people to rate their employers and bosses so that job seekers might search workplaces and "access inside information about what it's really like to work there." After

viewing an article on the Courthouse News Service[1] that detailed allegations of gender discrimination and a hostile workplace environment in a complaint filed by an employee against plaintiffs Petro-Lubricant Testing Laboratories, Inc. (PTL) and John Wintermute, defendant published an article on his website reporting on the same complaint.

The article, entitled "'Bizarre' and Hostile Work Environment Leads to Lawsuit," was posted on August 3, 2010. It repeated the allegations contained in the complaint which described Wintermute as a "violent bully, a racist, and a womanizer who regularly brought guns to the workplace." Allegations of Wintermute's explosive temper, his sexual affairs with female employees, and his retaliation by firing the employee when she refused to lie for the company in another employment-related lawsuit were also described.

In 2010, defendant also posted a webpage entitled "America's Worst Bosses 2010," a list that ranked bosses and named their employers. Wintermute was named in the list and a hyperlink led to the eBossWatch article.

---

[1] Courthouse News Service is an Internet-based news service that publishes original content, focusing on civil litigation nationwide.

In December 2011, an attorney representing plaintiffs wrote to defendant stating:

> It has recently come to our attention that you have published false and defamatory statements concerning our client in an article. This letter serves as your final notice to remove this article from your website or face liability under New Jersey law for defamation, defamation per se, and false light invasion of privacy.

The letter advised that defendant "may be held liable for significant monetary damages," and demanded defendant remove the article, related links, and metatags.

The letter stated that the employee "was fired from Petro-Lubricant for reasons unrelated to anything contained in her complaint" and that her "retaliatory lawsuit containing these baseless allegations" had been settled.

Defendant responded to plaintiffs' counsel that the "article is clearly a reporting of the complaint that was filed by [the employee] against [plaintiffs]. [O]ur article contains only factual statements about the abovementioned complaint and its allegations." Defendant stated further that "to make it even more clear that our article is a factual reporting of the [employee's] complaint, we have made some minor changes to the wording and to the article's title." The email provided counsel with a link to the updated article published in December 2011.

4

The article was also linked to the "America's Worst Bosses 2010" list.

A reading of the December 2011 article reveals that defendant changed the title to "Hostile Work Environment Lawsuit Filed Against Petro-Lubricant Testing Laboratories." He also removed a picture of the laboratory which had accompanied the first article. Although there was some rewording in the paragraphs, the content reported and the construction of the article remained the same.

In reporting the employee's claims, the earlier article stated: "[Wintermute] also allegedly forced workers to listen to and read white supremacist materials." The second posting deleted that wording and stated: "John Wintermute also allegedly regularly subjected his employees to 'anti-religion, anti-minority, anti-Jewish, anti-catholic, anti-gay rants.'"

In June 2012, plaintiffs filed a complaint against defendant alleging defamation, false light publicity, and intentional infliction of emotional distress as a result of the false and defamatory statements contained in the August 2010 eBossWatch article and the "America's Worst Bosses 2010" list. The complaint was amended in September 2012 to include defamation claims arising from the December 2011 posting.

5

In lieu of filing an answer, defendant moved for summary judgment. Noting the one-year statute of limitations for a libel or slander action, N.J.S.A. 2A:14-3, the motion judge found the August 2010 article and the December 2010 publication of the worst bosses list to be time-barred. He further concluded in his opinion and order of December 10, 2012 that issues of fact prevented the grant of summary judgment regarding the December 2011 re-posted article.

At the close of discovery both parties presented summary judgment motions. Defendant also moved to amend his answer and add a counterclaim for retaliation under the NJLAD, N.J.S.A. 10:5-12(d), as well as a motion seeking sanctions for plaintiffs' alleged discovery violations.

Following oral argument on May 21, 2015, the second motion judge[2] rendered an oral decision, with only a brief reference to the statute of limitations argument posited by defendant. He stated: "I'm satisfied that the Single Publication rule does not apply to the December 2011 article as that rule applies to a mass distribution of the same material." Therefore, he concluded the statute of limitations on the second article had not expired. Summary judgment, however, was granted to defendant

---

[2] A different judge presided over the second summary judgment applications.

on other grounds as the judge found the article was a "full, fair and accurate account of the [employee's complaint]" and therefore privileged as plaintiffs had failed to prove it had been published with actual malice. On the same date, the judge issued a written statement of reasons granting summary judgment to defendant and denying summary judgment to plaintiffs. Although the judge granted defendant's motion to amend the answer with a counterclaim, he denied the counterclaim as moot and denied defendant's sanction request.

On appeal, plaintiffs argue that the December 2011 article is "a separate and distinct publication from the August 2010 post" and therefore, the complaint was timely filed within the one-year statute of limitations. Plaintiffs contend the single publication rule does not apply to the second posting as the December 2011 article contained significant changes in its content, substance, and form from the earlier post. Plaintiffs also argue that the judge erred in deeming the article privileged. In his cross-appeal, defendant contends the judge's dismissal of his retaliation counterclaim and discovery sanction motion was error.

Amicus curiae, the Reporters Committee for Freedom of the Press, asserts that the "minor changes" made in the December 2011 article did not broaden any of the claims or allegations

set forth in the original posting, and therefore, under the single publication rule, the one-year statute of limitations applied and had expired prior to the filing of the complaint.

We review a grant of summary judgment under the same standard as the motion judge. Rowe v. Mazel Thirty, LLC, 209 N.J. 35, 41 (2012). We must determine whether there are any genuine issues of material fact when the evidence is viewed in the light most favorable to the non-moving party. Id. at 38, 41. "The inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)) (internal quotation marks omitted). "[T]he legal conclusions undergirding the summary judgment motion itself [are reviewed] on a plenary de novo basis," Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 385 (2010); including whether the statute of limitations applies, Churchill v. State, 378 N.J. Super. 471, 478 (App. Div. 2005).

The single publication rule was applied traditionally to "mass publications under which a plaintiff alleging defamation has a single cause of action, which arises at the first

publication of an alleged libel, regardless of the number of copies of the publication distributed or sold." Ibid.

In Churchill, we addressed the application of the single publication rule to an Internet publication of a document. Concluding that the "Internet appears to be particularly suited to application of the single publication rule," we found no basis to treat the Internet differently than other forms of mass media, and held the single publication rule applied to Internet publications. Id. at 483.

The plaintiffs in Churchill also argued that the updates made to the website constituted republications of the allegedly defamatory report, thus triggering a new statute of limitations upon each update. Id. at 477. We rejected that argument, finding that the updates "were merely technical changes to the website. . . . [T]hey in no way altered the substance or form of the report." Id. at 483. We concluded that "to treat the changes as republications would be inappropriate and defeat the beneficial purposes of the single publication rule." Id. at 483-84.

Mindful of that benchmark, we turn to an analysis of the two articles. Both posts are constructed similarly, each containing six paragraphs. As noted earlier, the title was changed between posts but the subject matter remained the same;

both articles report on a hostile work environment lawsuit. Although the wording used in the first two paragraphs is slightly different, the substance remains the same. The fourth, fifth, and sixth paragraphs are unchanged.

We look then at the third paragraph in the articles. The August post reads:

> [The employee] claims that John Wintermute is a violent bully, a racist, and a womanizer who regularly brought guns to the workplace and target practiced, hunted and gutted birds, which he then fed to his guard dogs, on company property. He also allegedly forced workers to listen to and read white supremacist materials, drank alcohol regularly throughout the workday, and was a violent, raging drunk.

The third paragraph of the December 2011 article states:

> [the employee] claims that John Wintermute is a "dangerous and violent alcoholic" who allegedly regularly brought guns to the workplace and target practiced, hunted and gutted birds, which he then fed to his dogs, on company property. John Wintermute also allegedly regularly subjected his employees to "anti-religion, anti-minority, anti-Jewish, anti-catholic, anti-gay rants."

The only substantive difference in the actual text of these articles is the elimination of the reference to Wintermute requiring his employees to listen to and read white supremacist materials; the later post instead quotes the employee's allegations that Wintermute subjected his employees to "anti-

religion, anti-minority, anti-Jewish, anti-catholic and anti-gay rants."

Communications posted on websites are viewed on a far wider scale than traditional mass media. Web postings are available for an indefinite period of time. If immaterial changes to an Internet post were to result in a retriggering of the statute of limitations on each occasion, the legislative purpose of favoring a short statute of limitations for defamation would be defeated. Therefore, the statute of limitations will only be triggered if a modification to an Internet post materially and substantially alters the content and substance of the article.

We note that the modifications in the second posting were intended by defendant to diminish the defamatory sting of the previously reported allegations after his receipt of plaintiffs' counsel's antagonistic correspondence. We find it a logical extension of our decision today to also conclude that a softening of prior material in a subsequent posting should not result in the commencement of a new statute of limitations. Therefore, if a minor modification diminishes the defamatory sting of an article, it should not trigger a new statute of limitations.

We reject the argument that the second post was altered in substance or form from the earlier posting as the differences

between the articles are immaterial. The allegedly defamatory information is the same in both articles. Paragraph three of the second posting was minimally altered to quote specific phrases contained in the complaint. The disseminated information stayed constant.

Therefore, we find the December 2011 article was not a republication and instead falls under the single publication rule. The one-year statute of limitations commenced with the posting of the original article in August 2010; therefore, the complaint filed in June 2012 is barred as untimely and defendants were entitled to summary judgment and a dismissal of plaintiffs' claims. As a result, we do not consider the remainder of plaintiffs' contentions.

We turn to defendant's cross-appeal. Defendant sought to assert a counterclaim on the grounds of retaliation under NJLAD, N.J.S.A. 10:5-12(d).[3] The facts presented in the summary judgment record are not sufficient to accord standing to defendant under the statute. There were no proofs that defendant had any relationship with the aggrieved employee or that he aided or encouraged her in asserting her rights in her

---

[3] "It shall be an unlawful employment practice . . . [f]or any person to take reprisals against any person because that person has . . . aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act."

NJLAD claim so as to confer him standing under the statute. See Craig v. Suburban Cablevision Inc., 140 N.J. 623, 630 (1995).

Moreover, defendant may be granted certain rights and protections under the First Amendment and the common law as a result of his claimed status as a journalist objectively reporting on employment litigation. He would not be entitled to those same safeguards if he were to be considered an advocate for the rights of the employee under the NJLAD. Although we disagree with the judge's determination that mootness required the dismissal of the counterclaim, we nevertheless find the dismissal to have been properly entered, as defendant lacked standing to assert the claim. See Isko v. Planning Bd. of Livingston, 51 N.J. 162, 175 (1968) ("[I]f the order of the lower tribunal is valid, the fact that it was predicated upon an incorrect basis will not stand in the way of its affirmance.").

Finally, we find the judge did not abuse his discretion in denying defendant sanctions for alleged discovery abuses.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION