JUSTICE ALBIN delivered the opinion of the Court.
*461 **243 Defamation law balances two competing interests-an individual's right to protect his reputation from unjustified and false aspersions and our citizens' right to free expression and robust debate in our democratic society. Because an informed public is a prerequisite to a functioning democracy, our common law provides special safeguards to protect speech from unwarranted attacks through the legal process. At issue in this case are two common law doctrines that protect speech from overreaching lawsuits: the single publication rule and the fair report privilege.
Generally, the single publication rule bars the resetting of the one-year statute of limitations governing a defamation action when multiple copies of a printed article are widely distributed and read. In this appeal, we must determine how the single publication rule applies to an article posted on a website and what changes to an article's content constitute a republication that triggers the running of a new statute of limitations.
Plaintiffs Petro-Lubricant Testing Laboratories, Inc., and its chief executive officer and co-owner, John Wintermute (collectively Wintermute), filed an action against defendant Asher Adelman alleging defamation per se, defamation, false light publicity, and intentional infliction of emotional distress. Adelman ran a website named "eBossWatch.com" that published a list of "America's Worst Bosses." The website posted an article recounting allegations in a civil complaint that Wintermute engaged in highly offensive workplace conduct and ranked Wintermute thirty-ninth on the worst-bosses list. After Wintermute complained about the article, Adelman modified it but not to Wintermute's satisfaction.
**244 Wintermute's lawsuit was filed within one year of the modified article's publication but outside the limitations period for the original article.
The trial court denied Adelman's summary judgment motion on statute-of-limitations grounds, finding that the single publication rule did not apply because the changes made to the original article constituted a second publication. The defamation action therefore was not time-barred. Nevertheless, the court granted summary judgment in favor of Adelman based on the fair report privilege because the modified article was a full, fair, and accurate report of a lawsuit filed against Wintermute. On that basis, the defamation lawsuit was dismissed.
The Appellate Division disagreed with the trial court's single-publication-rule analysis, concluding that the minor modifications to the second article did not transform the article into a second publication. Accordingly, the Appellate Division determined that the statute of limitations began to run when the original article was published and dismissed Wintermute's action as untimely.
*462 We now hold that the single publication rule applies to an internet article. However, if a material and substantive change is made to the article's defamatory content, then the modified article will constitute a republication, restarting the statute of limitations. In the record before us, there are genuine issues of disputed fact concerning whether Adelman made a material and substantive change to the original article. We therefore conclude that the Appellate Division erred in dismissing the defamation action based on the single publication rule at the summary judgment stage.
We concur, however, with the trial court that the modified article is entitled to the protection of the fair report privilege. The article is a full, fair, and accurate recitation of a court-filed complaint. The trial court properly dismissed the defamation action, and on that basis we affirm the Appellate Division's judgment.
**245 I.
A.
In addressing this appeal, we rely on the facts adduced in the summary judgment record.
Adelman established eBossWatch.com to provide job seekers with information about the work environment in certain companies and organizations. The website publishes an annual "America's Worst Bosses" list-a list compiled by "workplace experts" based on a methodology created by Adelman.
On August 3, 2010, the website published an article, drafted by an eBossWatch.com volunteer and edited by Adelman, entitled " 'Bizarre' and hostile work environment leads to lawsuit." The article details a gender-discrimination, workplace-harassment, and retaliation lawsuit brought against Wintermute by a former employee, Kristin Laforgia. The 2010 edition of "America's Worst Bosses"-published on December 15, 2010-ranked John Wintermute as number thirty-nine on the list of the one-hundred worst bosses. A hyperlink attached to Wintermute's name brought readers to the article.
The article summarized and quoted portions of Laforgia's eleven-page complaint. We recite only parts of the article here. The article described Wintermute as, among other things, "a violent bully, a racist, and a womanizer" who regularly used profanity and referred to women in the most vulgar and degrading language. The article also described Wintermute as having "an explosive temper when drunk," and stated that he "had or attempted to have affairs with several of Petro[-Lubricant]'s female employees" and "threatened to kill [one female employee] when she ended their relationship." Additionally, the article repeated Laforgia's allegation that she was fired because she refused to lie for the company when a retaliation lawsuit was brought by a former female employee. Of particular significance to the present appeal, the article indicated that Wintermute "allegedly forced workers to listen to and read white supremacist materials."
**246 More than one year later-on December 22, 2011-Wintermute's attorney sent a letter to Adelman, contending that the article was false and defamatory, that Laforgia's complaint was baseless, and that Laforgia and Wintermute had settled the lawsuit. The letter demanded the removal of Wintermute's name from the worst-bosses list and the article from the website and threatened legal action if Adelman did not comply.
In an email response, Adelman defended the article, stating that it contained no factual misstatements and was "clearly a reporting of [Laforgia's] complaint." Adelman, moreover, asserted that ranking Wintermute *463 on the list of the one-hundred worst bosses was clearly an expression of opinion protected by the First Amendment. Nevertheless, Adelman indicated that he "made some minor changes to the wording" of the article and its title "to make it even more clear that [the] article is a factual reporting of [Laforgia's] complaint."
Adelman provided a link to the modified article, entitled "Hostile Work Environment Lawsuit Filed Against Petro-Lubricant Testing Laboratories," which was posted in December 2011.[1] The modified article retained the original date of the article's publication. A number of changes were made to the article, some seemingly minor. In addition to altering the article's title, Adelman removed a photograph of Petro-Lubricant's sign from the article and changed some wording in the body of the article. For example, while the original article stated that Laforgia claimed Wintermute is "a violent, raging drunk," the modified article stated that Laforgia claimed he is "a 'dangerous and violent alcoholic.' "
The most significant change for purposes of this appeal is the replacement of, "[Wintermute] also allegedly forced workers to listen to and read white supremacist materials," with "John Wintermute also allegedly regularly subjected his employees to 'anti-religion, **247 anti-minority, anti-Jewish, anti-[C]atholic, anti-gay rants,' " quoting from Laforgia's complaint.
Adelman continued to rank Wintermute as number thirty-nine on eBossWatch.com's worst-bosses list, and a hyperlink to his name connected readers to the modified article.
B.
Unsatisfied with Adelman's response, plaintiffs filed the present defamation action. Adelman moved for summary judgment, contending that the statute of limitations and fair report privilege barred the lawsuit. Ultimately, the trial court concluded that the defamation claims relating to the publication of the original article and the worst-bosses list were time-barred. The court came to a different conclusion concerning the modified article. The court found that because of alterations to the original article, the single publication rule did not apply, and therefore the limitations period had not expired on the modified article. Nevertheless, in the end, the court held that the modified article fell within the ambit of the fair report privilege and dismissed the defamation lawsuit.[2]
C.
The Appellate Division disagreed with the trial court's finding that the modified article constituted a second publication. Petro-Lubricant Testing Labs., Inc. v. Adelman, 447 N.J. Super. 391, 400-01, 148 A.3d 441 (App. Div. 2016). The panel held that under the single publication rule, a new statute of limitations begins to run only "if a modification to an Internet post materially and substantially alters the content and substance of the article." Id. at 400, 148 A.3d 441. The panel determined that the modified article was "intended ... to diminish the defamatory sting" of the original article after Adelman received the attorney's letter threatening a lawsuit. Ibid. It reasoned that "if a minor modification **248 diminishes the defamatory sting of *464 an article, it should not trigger a new statute of limitations." Ibid.
According to the panel, the only "substantive difference" between the original article-"Wintermute requir[ed] his employees to listen to and read white supremacist materials"-and the modified article-"Wintermute subjected his employees to 'anti-religion, anti-minority, anti-Jewish, anti-[C]atholic and anti-gay rants' "-was "immaterial." Id. at 399-400, 148 A.3d 441. From the panel's perspective, "[t]he allegedly defamatory information is the same in both articles." Id. at 400, 148 A.3d 441. Because, in its view, the modified article did not represent a second publication, the single publication rule applied, and the one-year statute of limitations commenced when the original article was published in August 2010. Ibid. The panel therefore dismissed as untimely Wintermute's defamation lawsuit filed in June 2012, more than one year following publication of the original article. Id. at 400-01, 148 A.3d 441.
The panel did not decide whether the fair report privilege barred the defamation action, as the trial court had concluded.
We granted Wintermute's petition for certification. 229 N.J. 136, 160 A.3d 694 (2017). We also granted the motions filed by the American Civil Liberties Union of New Jersey (ACLU-NJ), the New Jersey Press Association, and the Reporters Committee for Freedom of the Press to participate as amici curiae.
II.
A.
Wintermute does not dispute that the single publication rule applies to internet postings. He urges this Court, however, to reject the Appellate Division's standard for determining when an internet article constitutes a republication triggering the running of a new statute of limitations. Wintermute argues that a republication occurs when modifications are made or material is added to a defamatory posting or when the modified posting is circulated to **249 attract a new audience. He also contends that a modified article does not lose its status as a second publication merely because the author intends to soften the defamatory impact or make the article "less" defamatory. Wintermute concludes that the changes made to the article as a whole, whether judged by the Appellate Division's or his proposed standard, constituted a republication.[3]
B.
Adelman submits that the Appellate Division applied the correct standard in finding that, under the single publication rule, the minor modifications to the article did not transform it into a second publication restarting the statute of limitations. He therefore asserts that Wintermute's defamation action is time-barred.
Amici curiae ACLU-NJ, the New Jersey Press Association, and the Reporters Committee for Freedom of the Press maintain that a republication occurs only if the modifications to an internet article are material and substantial and the modified article is intended to reach a new audience. They note that if the modified article is qualitatively the same as the original article, then the single publication rule applies. Amici also assert that changes to an article that soften its defamatory content should not be the basis for restarting a limitations period because publishers should not be punished for taking remedial measures.
*465 The Press Association argues that the definition of material modifications to an article, for republication purposes, are those "that result in a more negative view of [a complainant] in the mind of the reader than was created by the original version of the publication." In that vein, the ACLU-NJ contends that the term "white supremacist" is "widely understood to include animus based on race, religion, and sexual orientation," and therefore no qualitative difference exists between the original and modified articles. Finally, amici state **250 that because the source material for the modified article is a court-filed civil complaint, the article is protected by the fair report privilege.
III.
A.
We must decide when modifications to an allegedly defamatory internet article sufficiently alter the defamatory meaning of the article to render it a republication, triggering a new statute of limitations. The standard for determining what constitutes a republication is an issue of law that we review de novo. In setting that standard, we owe no deference to the interpretative conclusions reached by the trial court and Appellate Division. See Zabilowicz v. Kelsey, 200 N.J. 507, 512-13, 984 A.2d 872 (2009).
B.
A defamation action must be filed within one year of the publication of an actionable writing or utterance. N.J.S.A. 2A:14-3. Generally, every repetition of a defamatory writing or utterance gives rise to a separate cause of action under the multiple publication rule. Churchill v. State, 378 N.J. Super. 471, 479, 876 A.2d 311 (App. Div. 2005) ; Barres v. Holt, Rinehart & Winston, Inc., 131 N.J. Super. 371, 378-79, 330 A.2d 38 (Law Div. 1974), aff'd o.b., 141 N.J. Super. 563, 359 A.2d 501 (App. Div. 1976), aff'd o.b., 74 N.J. 461, 378 A.2d 1148 (1977) ; Restatement (Second) of Torts § 577A(1) cmt. a (Am. Law Inst. 1977) [hereinafter Restatement ]; see also Salzano v. N. Jersey Media Grp. Inc., 201 N.J. 500, 512, 993 A.2d 778 (2010) (noting that liability generally is imposed on "one who repeats or republishes the defamatory statements of another"). However, the application of this rule to mass publications would lead to an endless replication of legal actions and threaten a publisher with boundless financial liability. Churchill, 378 N.J. Super. at 480, 876 A.2d 311 (citing Firth v. State, 98 N.Y.2d 365, 747 N.Y.S.2d 69, 775 N.E.2d 463, 465-66 (2002) ). To **251 mitigate the harshness and unfairness of the inflexible application of the multiple publication rule, courts developed the "single publication rule." Id. at 478-79, 876 A.2d 311 ; Restatement § 577A(2) cmt. b.
Under the single publication rule, a speech or a single radio or television broadcast delivered to an audience of thousands of people or the issuance of the first edition of a newspaper or book gives rise to only one cause of action. Restatement § 577A(2) cmt. b, § 577A(3) cmt. c. The single publication rule "protect[s] defendants and the courts from the numerous suits which might be brought for the same words" carried through modern means of mass communication. Barres, 131 N.J. Super. at 385, 330 A.2d 38 (quoting Restatement § 577A(3) cmt. c). The rule ensures that a defamation action is brought within one year of an initial defamatory publication. See In re Phila. Newspapers, LLC, 690 F.3d 161, 175 (3d Cir. 2012). The rule therefore advances not only an express legislative policy favoring a shortened statute of limitations period in defamation cases, but also judicial economy by funneling *466 a plaintiff's multiple damage claims into a single cause of action. Churchill, 378 N.J. Super. at 479, 876 A.2d 311. In short, the single publication rule gives speech the protection it needs from vexatious and financially ruinous lawsuits that might stifle and inhibit the expression of ideas that inform and enlighten the public.
The single publication rule, however, has limits. The reprinting of an article in the next issue of a magazine or the delivery of the second edition of a book is deemed a republication-a second publication-giving rise to a new cause of action and the running of a new statute of limitations. Phila. Newspapers, LLC, 690 F.3d at 174 ; Restatement § 577A(3) cmt. d. Moreover, an article or book that is substantially modified from its initial release to its later issuance is also classified as a republication. See, e.g., Cox Enters., Inc. v. Gilreath, 142 Ga.App. 297, 235 S.E.2d 633, 634 (1977) (stating that "libelous statement differed in material respects in the various editions" and therefore "a cause of **252 action must be afforded for each edition of a newspaper"); Rinaldi v. Viking Penguin, Inc., 101 Misc.2d 928, 422 N.Y.S.2d 552, 556 (Sup. Ct. 1979) (finding republication because later-released book "had been substantially modified" from earlier version), aff'd, 52 N.Y.2d 422, 438 N.Y.S.2d 496, 420 N.E.2d 377 (1981).
IV.
Our defamation law generally does not distinguish between actionable conduct in print or electronic form or give lesser protection to speech in one medium or the other. See Too Much Media, LLC v. Hale, 206 N.J. 209, 234, 20 A.3d 364 (2011) ("The fact that [publications] appear on the Internet does not matter to the outcome [of determining whether they deserve protection under New Jersey's Shield Law]."). Indeed, most jurisdictions apply the single publication rule to internet publications. See Churchill, 378 N.J. Super. at 479-83, 876 A.2d 311. Therefore, whether in print or electronic media, "[r]epublication triggers the start of a new statute of limitations." Atkinson v. McLaughlin, 462 F.Supp.2d 1038, 1052 (D.N.D. 2006) ; Restatement § 577A(3) cmt. d. What constitutes republication in a website setting is the issue.
For this Court, defining the parameters of the single publication rule, particularly in the context of a website publication, is a matter of first impression. We therefore look to other courts for guidance.
In Churchill, the Appellate Division applied the single publication rule to online publications. 378 N.J. Super. at 478, 876 A.2d 311. There, the State Commission of Investigation (SCI) posted on its public website a report that the plaintiffs alleged improperly impugned their integrity. Id. at 475, 876 A.2d 311. The plaintiffs filed a defamation action against the SCI and its agents more than a year after the report's first appearance on the website. Ibid. The Appellate Division rejected the plaintiffs' arguments that the SCI repeatedly republished the report by maintaining it continuously on the SCI website and by altering the website's homepage various times to draw more attention to the report.
**253 Id. at 483-84, 876 A.2d 311. In applying the single publication rule, the Appellate Division held that no principled reason justified "treating the Internet differently than other forms of mass media." Id. at 483, 876 A.2d 311. It also concluded that the technical changes to the website's homepage merely "altered the means by which website visitors could access the report," but in no way altered the report itself, and therefore did not cause a republication. Id. at 483-84, 876 A.2d 311.
*467 We agree that the beneficent purpose of the single publication rule applies as strongly to the internet as it does to traditional media. Books, magazines, and movies remain in libraries and homes, where they are continuously available to new viewers for unlimited periods. Articles attached to a website stand in a similar position.
Here we must determine when an internet article is sufficiently altered that it becomes a republication giving rise to a new cause of action. In addressing the types of modifications to online articles that will not justify the protection of the single publication rule, we first look to general principles of defamation law.
Every defamation case involves an assessment of "whether the statement at issue is reasonably susceptible of a defamatory meaning." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 765, 563 A.2d 31 (1989) (citing Decker v. Princeton Packet, Inc., 116 N.J. 418, 424, 561 A.2d 1122 (1989) ). "A defamatory statement, generally, is one that subjects an individual to contempt or ridicule, one that harms a person's reputation by lowering the community's estimation of him or by deterring others from wanting to associate or deal with him." Durando v. Nutley Sun, 209 N.J. 235, 248-49, 37 A.3d 449 (2012) (quoting G.D. v. Kenny, 205 N.J. 275, 293, 15 A.3d 300 (2011) ). Deciding whether a statement is defamatory requires an evaluation of "the fair and natural meaning" of the challenged words through the perspective of a reasonable person. Romaine v. Kallinger, 109 N.J. 282, 290, 537 A.2d 284 (1988) (quoting **254 Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420, 431, 138 A.2d 61 (App. Div. 1958) ). The allegedly defamatory statements must be viewed in the context of the whole publication. Ibid. Whether a modified article is a republication will depend-in large part-on whether the altered article contains defamatory statements not expressed in the original article.
Courts in other jurisdictions have adopted legal constructs for determining when the defamatory content or substance of an internet article is sufficiently altered to constitute a republication. For example, in Davis v. Mitan (In re Davis), the United States District Court for the Western District of Kentucky held that "where substantive material is added to a website, and that material is related to defamatory material that is already posted, a republication has occurred." 347 B.R. 607, 612 (W.D. Ky. 2006) (emphasis added). In that case, the defendants filed for bankruptcy and blamed the plaintiffs for their financial troubles. Id. at 609-10. The defendants created a website, described by the bankruptcy court as a "scandal sheet," which suggested that the plaintiffs were "con artists." Id. at 610. The claims in the plaintiffs' initial defamation action were filed beyond the one-year statute of limitations and dismissed. Ibid. Afterwards, the defendants updated their website, listing "additional nefarious activities" in which the plaintiffs allegedly engaged. Ibid. The plaintiffs then filed a new defamation action. Ibid. The District Court declined to dismiss the second action on statute of limitations grounds, finding that the new defamatory information was substantive in nature and constituted a republication. Id. at 612.
Similarly, in Larue v. Brown, the Court of Appeals of Arizona held that republication occurs on a website when an "update or modification [of an internet publication] affects the substance of the allegedly defamatory material." 235 Ariz. 440, 333 P.3d 767, 772 (App. 2014). In Larue, the statute of limitations had expired on the original defamatory internet articles.
*468 Ibid. However, the defendants' responses to readers' comments-posted directly below the original articles-not only repeated the earlier defamatory allegations, but "also added to and altered the substance **255 of the original material." Id. at 773. The Arizona appellate court concluded that the defendants' responses to its website's readers constituted a republication and therefore the defamation suit was brought within the limitations period. Ibid.; see also Yeager v. Bowlin, 693 F.3d 1076, 1082 (9th Cir. 2012) (holding that statement on website is republished when "the statement itself is substantively altered or added to, or the website is directed to a new audience").
In contrast, the addition of new material to a website unrelated to an earlier allegedly defamatory report posted on the site will not reset the statute of limitations. See Churchill, 378 N.J. Super. at 478, 876 A.2d 311. The New York Court of Appeals made this point in Firth, 747 N.Y.S.2d 69, 775 N.E.2d at 466. In Firth, the State Inspector General issued a report that the claimant alleged was defamatory. Id., 747 N.Y.S.2d 69, 775 N.E.2d at 464. More than a year after the report was posted on a government website, the claimant brought a defamation action against the state. Ibid. The Court of Appeals held that the Inspector General's posting of an unrelated report on the same government website did not count as a republication of the earlier report about the claimant. Id., 747 N.Y.S.2d 69, 775 N.E.2d at 466. The Court of Appeals noted that "it is not reasonably inferable that the addition [of unrelated material on a website] was made either with the intent or the result of communicating the earlier and separate defamatory information to a new audience." Ibid.; see also Atkinson, 462 F.Supp.2d at 1054-55 (updating list of names and addresses of Board of Directors was unrelated to defamatory content and not republication because it "did not materially or substantially alter the substance or content").
These cases illustrate that not every alteration to a website will restart the statute of limitations period on a defamation claim. Technical website changes and alterations unrelated to the substance of the allegedly defamatory content in the article do not constitute republication. We do not suggest that changes to a website intended to pitch an article to an entirely new audience may not constitute a republication. That issue is not before us.
**256 In this case, our focus must be on changes to the content or substance of the article itself in determining whether a republication has occurred. We distill the following principle from the cases that we have discussed: a republication occurs to an online publication if an author makes a material and substantive change to the original defamatory article.
A material change is one that relates to the defamatory content of the article at issue. See Black's Law Dictionary 638 (9th ed. 2009) (defining "material evidence" as "[e]vidence having some logical connection with the facts of consequence or the issues"). A material change is not a technical website modification or the posting on the website of another article with no connection to the original defamatory article.
A substantive change is one that alters the meaning of the original defamatory article or is essentially a new defamatory statement incorporated into the original article. See Webster's Third New International Dictionary 2280 (1981) (defining "substantive" as "having the character of an independent self-subsistent ... thing: ... not derivative or dependent"). A substantive change is not the mere reconfiguring *469 of sentences or substitution of words that are not susceptible of conveying a new defamatory meaning to the article.
V.
Given that standard, we must determine whether the Appellate Division properly entered summary judgment in favor of Adelman on the basis of the single publication rule. In deciding that issue, "we apply the same standard governing the trial court-we view the evidence in the light most favorable to the non-moving party." Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584, 46 A.3d 1262 (2012). Our function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995) (quoting **257 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). Only "when the evidence 'is so one-sided that one party must prevail as a matter of law' " should a court enter summary judgment. Ibid. (quoting Liberty Lobby, 477 U.S. at 252, 106 S.Ct. 2505 ).
We find that the Appellate Division erred in granting summary judgment on statute of limitations grounds because a genuine issue of fact was in dispute concerning whether a republication occurred.
The issue is whether the changes to the defamatory content of the original article were material and substantive, thus rendering the modified article a republication. Most of the changes to the article were minor in nature, such as replacing the article's title and the photograph at the top of the page. For instance, we see no substantive distinction between the article's description of Wintermute as "a violent, raging drunk" in the original article, and as "a 'dangerous and violent alcoholic' " in the modified article. Those changes did not constitute a republication.
We come to a different conclusion, however, concerning the modified article's allegations that Wintermute expressed animus toward specific groups based on religion, ethnicity, and sexual orientation. The original article stated that "[Wintermute] also allegedly forced workers to listen to and read white supremacist materials." The modified article deleted that allegation and replaced it with the following: "John Wintermute also allegedly regularly subjected his employees to 'anti-religion, anti-minority, anti-Jewish, anti-[C]atholic, anti-gay rants.' "
The differences here are not technical or semantic. Both allegations-imputing to him white supremacist views and imputing to him a specific animus toward people based on their religious denominations and sexual orientations-clearly are defamatory by impugning Wintermute's character. But it is one thing to write that Wintermute "forced workers to listen and read white supremacist materials" and another to write that he "regularly subjected his employees" to rants against people of the Jewish and Catholic faiths, minorities, and gay people.
**258 White supremacists do not necessarily have a monolithic and uniform belief structure. See Alejandro Beutel, Nat'l Consortium for the Study of Terrorism and Responses to Terrorism, Key Concepts to Understand Violent White Supremacy 1-3 (Apr. 2017) [hereinafter Beutel, Key Concepts to White Supremacy ]. Although white supremacist groups share "the same general belief that Whites are superior to other races," they "also have major ideological differences." Id. at 1-2; see Chip Berlet & Stanislav Vysotsky, Overview of White Supremacist Groups, 34 J. Pol. & Mil. Soc. 11, 11 (2006) [hereinafter *470 Berlet & Vysotsky]. Although some white supremacists may hold "anti-religious" views, many others root their beliefs in their religious faith. See Peterson v. Wilmur Commc'ns, Inc., 205 F.Supp.2d 1014, 1015 (E.D. Wis. 2002) ; People v. Lindberg, 45 Cal.4th 1, 82 Cal.Rptr.3d 323, 190 P.3d 664, 694 (2008) ; see also Joe R. Feagin et al, White Racism 106-07 (2d ed. 2001) (noting that one important white supremacist group is "the Christian Identity movement, a religious denomination whose members believe that God's chosen people are white Anglo-Saxon Protestants"). While most white supremacists hold "anti-Jewish" beliefs, some do not. See Beutel, Key Concepts to White Supremacy at 2. And though most white supremacists hold "anti-gay" beliefs, not all do. See Berlet & Vysotsky at 14 n.1; Walter M. Hudson, Racial Extremism in the Army, 159 Mil. L. Rev. 1, 11 n.45 (1999).[4]
A reasonable person might not believe that all white supremacists hold anti-religious or anti-gay views. However, a Catholic, a Jew, a minority, and a gay person will almost certainly take offense when they are the specific target of a hateful rant. Reasonable people may disagree about the scope of a white supremacist's belief system; reasonable people will not disagree **259 about the meaning of anti-Semitic, anti-Catholic, and anti-gay rants.
Clearly, the change to the article was material-relating to the article's defamatory content. At the very least, genuine issues of fact are in dispute about whether the modification to the original article was substantive-that is, whether it injected a wholly new defamatory statement into the article. The analysis is no different merely because the original article already had defamatory statements. See Davis, 347 B.R. at 612 ; Larue, 333 P.3d at 773.
We reject the Appellate Division's suggestion that Adelman's purported intention to lessen the defamatory sting of the modified article somehow alters the assessment of whether the new defamatory material constitutes a republication. See Petro-Lubricant Testing Labs., Inc., 447 N.J. Super. at 400, 148 A.3d 441. Good intentions, without more, do not diminish the impact that defamatory words have on undermining another's reputation.[5] We also do not agree with the Appellate Division's suggestion that the new defamatory material resulted in a "softening" of the original article.
Our conclusion that Adelman is not entitled to summary judgment under the single publication rule does not mean that Adelman exposed himself to additional liability by modifying the article. Adelman is not liable for taking the remedial measure of quoting directly from Laforgia's complaint, a public document on file with the New Jersey judiciary, because he is protected by the fair report privilege.
VI.
A.
The fair report privilege "protects the publication of defamatory matters that appear in a report of an official action or **260 proceeding." Salzano, 201 N.J. at 513, 993 A.2d 778. The privilege "extends to defamatory statements contained *471 in filed pleadings that have not yet come before a judicial officer." Id. at 519, 993 A.2d 778.
The right of citizens to have transparency in government and court proceedings is one of the basic pillars undergirding the fair report privilege. See id. at 520, 993 A.2d 778 ("[T]he public has a right of access not only to our courts, but also to court records." (quoting Report of the New Jersey Supreme Court Special Committee on Public Access to Court Records § 2.1.1 (Nov. 29, 2007) ) ). The privilege recognizes that "[m]embers of the public simply cannot attend every single court case and cannot oversee every single paper filing" and that protection must be given to those who "fairly and accurately" report "on every aspect of the administration of justice, including the complaint and answer, without fear of having to defend a defamation case." Ibid.
Thus, the fair report privilege extends to "[a] full, fair, and accurate report regarding a public document that marks the commencement of a judicial proceeding," including a civil complaint alleging discrimination or retaliation. See id. at 521-22, 993 A.2d 778 (applying fair report privilege to article written about bankruptcy complaint). The fair report privilege applies to a report of a court-filed complaint regardless of "the truth or falsity of the initial allegations and defenses" because citizens have a right to know what "has been filed in court and how the judicial system responds to it." Id. at 521, 993 A.2d 778. Even when a report is "not ... exact in every immaterial detail," the privilege will apply provided that the account conveyed is "substantially correct." Id. at 523, 993 A.2d 778 (quoting Costello v. Ocean Cty. Observer, 136 N.J. 594, 607, 643 A.2d 1012 (1994) ).
Although the trial court squarely addressed the fair report privilege and dismissed the lawsuit on that ground, the Appellate Division did not reach that issue. The petition for certification challenged only the Appellate Division's dismissal of the lawsuit based on the single publication rule, not the trial court's dismissal **261 based on the fair report privilege. Nevertheless, the fair report privilege was aired in the parties' and amici's Appellate Division and Supreme Court briefs and was thoroughly discussed during oral argument. We have reviewed the modified article and Laforgia's complaint. There is no question that the article is substantially correct in its rendition of the complaint. The statement alleging a specific animus against certain groups is a direct quotation from the complaint. Allowing the lawsuit to proceed would be a needless waste of resources of the parties and the court system and would impose an undue cost on speech that the fair report privilege is intended to protect.
B.
The modified article is protected by the fair report privilege because the article is a full, fair, and accurate report of Laforgia's civil complaint filed in Superior Court, which alleged, at great length, gender discrimination, workplace harassment, and retaliation. Adelman's modified article essentially recounted the allegations set forth in Laforgia's complaint.
Laforgia's complaint alleged, among other things, that Wintermute (1) "is a dangerous and violent alcoholic," (2) "regularly uses profanity in the workplace and has referred to female employees" in offensive and derogatory terms, (3) "has an explosive temper while drunk," (4) "is an avowed atheist and white supremacist," (5) "regularly subjects his employees to anti-religion, anti-minority, anti-Jewish, anti-[C]atholic, anti-gay rants," (6) "regularly listens to broadcasts from white supremacists *472 and will turn up the broadcasts so loudly that employees are forced to hear it," and (7) "hands out hate-filled white supremacist and atheist books and papers and requires his employees to read them."
Any reasonable person reading the modified article would understand that it was reporting on facts alleged in a civil complaint.
Wintermute argues that Adelman should be stripped of the privilege because the modified article failed to report that **262 Wintermute and Laforgia had settled the case. A settlement of the lawsuit, however, is not an adjudication of the truth or falsity of a complaint's allegations. The fair report privilege may not protect a publication that only reprints the allegations but not the favorable verdict. Salzano, 201 N.J. at 524, 993 A.2d 778 ; see also Hudak v. Times Publ'g Co., 534 F.Supp.2d 546, 576-77 (W.D. Pa. 2008). A settlement, however, is different from a favorable verdict. A settlement generally "reflects ambiguously on the merits of the action" and is not a determination of whether the allegations are true or false. See McCubbrey v. Veninga, 39 F.3d 1054, 1055 (9th Cir. 1994) (quoting Pender v. Radin, 23 Cal.App.4th 1807, 29 Cal.Rptr.2d 36, 40 (1994) ).
Here, the parties agreed that the terms of the settlement would remain confidential, and therefore the settlement terms were not made available to the public. Nothing in the record suggests that the settlement, which resulted in a dismissal of the complaint, constituted a judgment on the merits or on the truth or falsity of the allegations. In the mind of some readers, reference to a settlement might even have suggested an admission of fault.
In short, we conclude that the modified article is a full, fair, and accurate account of a court-filed complaint alleging gender discrimination, workplace harassment, and retaliation and is protected by the fair report privilege.
VIII.
In conclusion, the Appellate Division improperly entered summary judgment, dismissing Wintermute's lawsuit based on the single publication rule. Genuine factual issues were in dispute concerning whether the modified article constituted a republication, restarting the statute of limitations.
We also find that the trial court properly dismissed Wintermute's lawsuit based on the fair report privilege. The modified article gave a full, fair, and accurate account of a court-filed civil complaint.
**263 The judgment of the Appellate Division dismissing Wintermute's defamation action is affirmed as modified.
JUSTICES LaVECCHIA, PATTERSON, and FERNANDEZ-VINA join in JUSTICE ALBIN's opinion. JUSTICE SOLOMON filed a concurring opinion, in which CHIEF JUSTICE RABNER and JUSTICE TIMPONE join.

The exact date of the publication of the modified article is unknown but likely occurred on or about December 22, 2011.

We do not recite those portions of the procedural history not germane to the appeal before us.

Although the Appellate Division's opinion does not address the fair report privilege, Wintermute argued before the panel that the privilege could not be invoked because Adelman failed to inform the reader that the Laforgia lawsuit had settled.

The concurrence refers to white supremacists and members of the Ku Klux Klan interchangeably. See post at 264-65, 184 A.3d at 473-44. However, although all members of the Ku Klux Klan are white supremacists, not all white supremacists are members of the Ku Klux Klan. See Berlet & Vysotsky at 17.

Good intentions and remedial conduct may be factors in determining certain categories of damages. See N.J.S.A. 2A:43-2 ; see also Bock v. Plainfield Courier-News, 45 N.J. Super. 302, 311, 132 A.2d 523 (App. Div. 1957).