**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2530-18T1

PAUL CROOK,

    Plaintiff-Appellant,

v.

HARRAH'S ATLANTIC CITY
OPERATING CO., LLC d/b/a
HARRAH'S RESORT ATLANTIC
CITY,

    Defendants-Respondents.

_____

Argued February 6, 2020 – Decided July 9, 2020

Before Judges Alvarez and Nugent.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-1308-17.

Jeffrey V. Stripto argued the cause for appellant (Law Offices of Roy D. Curnow, attorneys; Roy D. Curnow, on the briefs).

Justin A. Britton argued the cause for respondents (Cooper Levenson, PA, attorneys; Justin A. Britton and Russell L. Lichtenstein, on the brief).

PER CURIAM

Plaintiff, Paul Crook, appeals the summary judgment dismissal of his personal injury complaint, which alleged that he slipped, fell, and sustained injuries on steps leading to a pool in defendant Harrah's Atlantic City Operating Co.'s (Harrah's) hotel and casino. Because we conclude genuine issues of material fact should have precluded the grant of summary judgment to Harrah's, we reverse and remand for trial.

This action's procedural history is uneventful. In March 2017, plaintiff filed his negligence complaint against Harrah's in Monmouth County. Harrah's answered and later filed a motion to change venue to Atlantic County, which the court granted. Following completion of discovery, Harrah's moved for summary judgment. The trial court granted the motion and plaintiff filed this appeal.

The motion record, construed in the light most favorable to plaintiff as the non-moving party, Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 256 (2018), includes the following facts. Plaintiff, an employee of a liquor establishment, was attending a liquor industry convention at Harrah's with a co-worker and his boss during the March 2015 evening of this fall. The convention was held in an area known as the Pool After Dark (the pool room), which plaintiff described as a large "nightclub setting" with an unoccupied pool in the

middle. According to plaintiff, the pool room was dimly lit, crowded, and humid. Plaintiff, his co-worker, and his boss walked around the pool room for approximately an hour visiting various exhibit booths. When they finished visiting the booths, they walked toward a three-step stone staircase, which they had to descend. Plaintiff's boss and co-worker descended the stairs without incident. Plaintiff, following behind, slipped on the second step, missed the last step, and landed "Indian style" on the floor, injuring his left knee.

In his deposition, plaintiff testified there was a landing and three steps in the area where he fell. He described his fall as follows:

> I'm just basically walking as normal, like a regular person, like regular, and went to step down. Got down the first step. Went to the second step getting read[y] to go to the third step. My foot just went from underneath me. I completely missed the last step to get to the bottom. Went directly to the bottom, and my left leg went underneath me. At the same time I kind of went falling down Indian style.

Plaintiff explained that after he fell, he noticed moisture on the step. Asked to describe what he meant by moisture, he replied: "Like condensation. Like little drips of water when we looked back, but I didn't see it at first." Asked for a detailed description, plaintiff said he was not sure, "but it was basically like I want to say a wet spot. I guess." He added: "Because it was kind of humid in there, also. The [p]ool, it was, like real packed in there. So, it was really

3

basically squeeze by, turn to the side room, and there was a lot of people in there."

Pressed further to describe what he saw on the steps, plaintiff said he "couldn't really see" but felt that it was wet. He explained, "[b]ecause as I went to push up, you know, that's the first thing I grabbed was, like, the step to help myself up." He further explained that he grabbed the second step and his hands were wet with water, but he didn't have a drink.

Plaintiff was wearing Timberland construction boots with rubber soles. After he fell, security personnel arrived with a wheelchair and removed him to a back room. Plaintiff told the security guard what happened. Asked during his deposition what the security person said about a dress code, plaintiff responded: "When he asked how it happened, he looked down and saw I was wearing boots. I had on Tims. 'That's why we don't allow people to wear boots,' and I said nobody told us."

Plaintiff provided the certification of the co-worker who was with him when he fell. The co-worker stated:

> One of the Harrah's employees who had attended to
> [plaintiff] spoke to me; he stated (as did [plaintiff]) that
> he ([plaintiff]) had slipped on moisture on one of the
> steps. Referring to [plaintiff's] footwear (rubber-soled
> construction boots), the employee (a male) stated to me

that "this is why we don't allow people with boots in the pool area."

Plaintiff also submitted an expert report from a consulting engineer. The engineer described the stairs as "masonry construction[,] . . . approximately 102.5-inches in overall width[,]" with stair riser heights and tread widths of approximately six and twelve inches, respectively. She reported, "[t]he overall stair count is three . . . steps from the pool area to the upper landing area." She also noted handrails were located on both sides of the stairs.

The engineer opined the wet marble treads created a dangerous condition that caused plaintiff's fall. She tested the steps, wet and dry, for a coefficient of friction. "The coefficient of friction, a dimensionless number, reflects the level of floor traction, enabling persons with the ability to safely traverse without slippage or falling events." According to the expert's report, the American National Standards Institute (ANSI) and the National Floor Safety Institute (NFSI) determined that a coefficient of friction value of 0.60 is "High Traction" with a "lower probability of slipping," while a coefficient of friction value from 0.40 to 0.60 is "Moderate Traction" with an "increased probability of slipping." The American Society for Testing and Materials (ASTM) recommends a coefficient of friction value of 0.5 and the Americans with Disability (ADA) Code requires a coefficient of friction level of 0.6 for floor surfaces. The

5

engineer performed tests to determine the coefficient of friction of the steps in

a dry state, 0.62, and in a wet state, 0.45. The engineer explained:

> The reduction in traction represents an increase in slipperiness, which is captured by the coefficient of friction testing performed herein. Therefore, the subject floor friction levels when matched against the accepted industry standards and applicable codes (Code of Federal Regulations, etc.), the resulting wet floor fails to comply and produces a hazardous and dangerous walking surface condition. In other words, slippage occurs due to the diminished traction available, which falls below the code required levels (0.6 coefficient of friction) and the floor wetness coupled with the lack of proper maintenance, i.e., floor mopping efforts to maintain sanitary levels and/or carpeted mat usage to cover the wetness to safeguard the public from wet floor conditions, resulted in the slippage event, causing the plaintiff's injury to occur.

The engineer's inspection of the steps included photographing them.

Concerning "Photo 6," the report states:

> Detailed view of the stair tread surface. Not[e] the lack of abrasive material and the smooth (shine) on the stair tread. Also note the lack of stair tread nosing delineation. Furthermore, the photo was taken with water placed upon the stair tread which is not readily discernible; even in daylight hours. As such, wetness on the stair surface during "club-like" lighting conditions would not be observable to the plaintiff. Note the depressions in the stair tread which likely capture and "pool" water in the same; thus preventing any water from running off the surface and to remain on same.

6

The engineering expert explained, "the wetness/wet substance present and the absence of nonslip/abrasive surfacing . . . on the stair tread regions yielded unsafe conditions for pedestrians." She added, "[t]he plaintiff's fall occurred because the amount of traction (frictional force) generated between the shoe sole material and contact walking surface was insufficient due to the wetness on the floor surface; thereby inhibiting the plaintiff's natural upright stability, which results in fallings." The engineer opined "the fact that the stair surface, adjacent to a pool (with water), creates an inherently slippery and dangerous walking surface condition . . . further intensifies the hazard to pedestrians."

The expert concluded:

> In my opinion, the plaintiff's injury would have been avoided had the interior egress stairs been properly maintained in accordance with applicable codes, accepted industry standards and reasonable safety practice and had the stair treads been constructed or altered with non-slip surface. Therefore, had the property owner/manager commercial business establishment/responsible entity endeavored to maintain the interior egress stairs free of hazardous conditions and/or posted warning signage forewarning the public of an inherently hazardous walking surface hazard, then it is further my opinion that the plaintiff's injury in this instance would have been avoided.

> Additionally, the above-mentioned stairway hazards represent a condition that could have been avoided through a reasonable inspection of the property. Therefore, the aforementioned hazard's existence,

7

clearly underscores the lack of proper maintenance afforded to the property, which ultimately caused the plaintiff's injury to occur.

In the oral opinion it delivered from the bench following argument on the motion, the trial court determined Harrah's had no actual or constructive notice of the condition that caused plaintiff's fall. Specifically, the court found "the plaintiff did not demonstrate in his moving papers that Harrah's created the moisture, condensation or the wet spot on the steps, or had actual or constructive notice of same." The court made no reference in its opinion to the statements of the security personnel about why work boots were prohibited in the pool area.

Concerning plaintiff's expert, the trial court found the expert expressed a net opinion. The court rejected the opinion because the expert based it on plaintiff's testimony that the step was wet. The court stated, "this [c]ourt finds that the record does not reflect what plaintiff slipped on or that the plaintiff slipped on any particular liquid." Because the expert based her testimony on a factual predicate the trial court found did not exist, namely, the step plaintiff slipped on was wet, the court rejected the expert's testimony.

Plaintiff appeals from the order granting summary judgment. He argues that genuinely disputed issues of material fact should have precluded the grant of summary judgment. He contends no explanation exists for the trial court

overlooking the significance of his footwear other than the court having considered the certification from a defense witness that the court said it would not consider. He also argues the trial court's "finding of fact" that he did not establish water was on the step is contradicted by his deposition testimony; consequently, the court's finding amounted to a determination of a disputed fact that usurped the function of the factfinder. Last, he argues the trial court's finding that his expert expressed a net opinion is based on the court's factual determinations that are contradicted by the record and the court's disregard of the standards the expert cited in her report.

Harrah's responds that the trial court did not err in determining plaintiff could not prove negligence because plaintiff was incapable of establishing Harrah's knew or should have known of the alleged dangerous condition. Harrah's argues that plaintiff's expert did indeed express a net opinion. Harrah's also argues the court did not rely upon an improper certification from a witness in reaching its conclusion.

In evaluating these arguments, we are guided by settled legal principles. A trial court's order granting summary judgment is entitled to no "special deference" by an appellate court and is subject to de novo review. Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016). Appellate

courts "review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); R. 4:46-2(c). Here, we conclude genuine issues of material fact preclude the grant of summary judgment to Harrah's.

For purposes of the summary judgment motion, Harrah's conceded plaintiff was a business invitee. "Business owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is within the scope of the invitation." Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563 (2003). "The duty of due care to a business invitee includes an affirmative duty to inspect the premises and 'requires a business owner to discover and eliminate dangerous conditions, to maintain the premises in safe condition, and to avoid creating conditions that would render the premises unsafe.'" Troupe v. Burlington Coat Factory Warehouse Corp., 443 N.J. Super. 596, 601 (App. Div. 2016) (quoting Nisivoccia, 175 N.J. at 563).

"Ordinarily an injured plaintiff asserting a breach of that duty must prove, as an element of the cause of action, that the defendant had actual or constructive knowledge of the dangerous condition that caused the accident." Nisivoccia,

175 N.J. at 563 (citing <u>Brown v. Racquet Club of Bricktown</u>, 95 N.J. 280, 291 (1984)). A plaintiff may prove constructive notice by establishing "the condition existed 'for such a length of time as reasonably to have resulted in knowledge and correction had the defendant been reasonably diligent.'" <u>Troupe</u>, 443 N.J. Super. at 602 (quoting <u>Parmenter v. Jarvis Drug Stores, Inc.</u>, 48 N.J. Super. 507, 510 (App. Div. 1957)).

In addition, "[c]onstructive notice can be inferred in various ways." <u>Ibid.</u> For example, "[t]he characteristics of the dangerous condition giving rise to the slip and fall, or eyewitness testimony, may support an inference of constructive notice about the dangerous condition." <u>Ibid.</u> (citations omitted).

In some instances, due to equitable considerations, a plaintiff may be relieved of proof of actual or constructive notice. <u>Nisivoccia</u>, 175 N.J. at 563. Thus, "when a substantial risk of injury is inherent in a business operator's method of doing business, the plaintiff is relieved of showing actual or constructive notice of the dangerous condition." <u>Id.</u> at 564. In those circumstances, "[t]he plaintiff is entitled to an inference of negligence, shifting the burden of production to the defendant, who may avoid liability if it shows that it did 'all that a reasonably prudent [person] would do in light of the risk of

injury [the] operation entailed.'" Id. at 564-65 (third alteration in original) (quoting Wollerman v. Grand Union Stores, Inc., 47 N.J. 426, 429 (1966)).

Applying these principles to the facts on the motion record under our established standard of review, we conclude plaintiff's complaint should not have been dismissed on summary judgment. First and foremost, a factfinder could reasonably infer the step plaintiff slipped on was wet. Plaintiff said it was wet. Specifically asked during his deposition whether he saw anything before he fell, the plaintiff replied he had not. When prodded, "what about after you fell," defendant responded, directly and unequivocally, "[t]here was moisture." Pressed further to describe what he meant by moisture, he said "[l]ike little drips of water when we looked back, but I didn't see it at first." He added that it was a wet spot. He also noted the humidity was high. Later in his deposition, he added that the step was wet and that he felt it.

That plaintiff did not perceive the step was wet before he fell is understandable, particularly when considered in light of his expert's testimony and the photographs she included with her report. According to this evidence, water on the step could not be discerned even when the area was well lit, in contrast to the lighting on the night plaintiff fell. In short, if a factfinder

determines plaintiff's testimony is credible, the factfinder can readily find the step was wet.

Moreover, a reasonable factfinder could also infer from the statement security personnel made to plaintiff and plaintiff's co-worker, particularly considering the context in which the statements were made, that the condition was recurring and posed a danger to patrons wearing boots. That evidence, considered in light of plaintiff's engineering expert's conclusions based on coefficients of friction on dry and wet stairs, supported the inference that Harrah's personnel were aware of the condition and had implemented a prohibition against wearing boots for that very reason. As previously noted, the trial court did not mention the statements of the security personnel when it delivered its opinion.

Plaintiff's failure to identify the precise cause of the wet step is not fatal. Patrons were not using the pool the night plaintiff fell, so that is an unlikely source of the moisture on the steps. Plaintiff apparently thought the humidity caused the moisture. The source of the moisture, however, is not critical. The knowledge the step when wet became a slipping hazard for people with boots, and the foreseeability that the steps would become wet during Harrah's operation of the pool room—for patrons using the pool, for business invitees attending a

13

conference or convention, or for some other event—were facts from which a jury could determine Harrah's breached its duty by not warning plaintiff or taking other measures suggested by plaintiff's expert.

We would be remiss if we did not comment on Harrah's attempt to submit the certification of a witness, not previously identified, concerning the pool room dress code and other issues. Plaintiff objected to the use of the witness's certification because the witness had not been named as such in Harrah's interrogatory answers or elsewhere until after the first trial listing and after the summary judgment motion was filed. Although the trial court, for other reasons, did not consider the certification, our opinion should not be construed as condoning such a practice. The non-disclosure of a key witness until after discovery has ended can render meaningless the time and money a party who complies with the court rules has expended in fairly conducting discovery. We note only that a trial court has broad discretion and a range of remedies to discourage such practice.

Last, we emphasize that our reversal includes the trial court's finding plaintiff's expert expressed a net opinion. That said, we have not and do not suggest plaintiff's expert either has, or has not, rendered a net opinion. The trial court's decision the opinion was net is based on the erroneous determination

plaintiff did not establish the step he slipped on was wet. Whether the opinion is net, as is the case with any expert, can be appropriately addressed during a hearing conducted pursuant to N.J.R.E. 104, where a comprehensive record can be made in the event the need for appellate review arises in the future.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2530-18T1