******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# SEAN MURPHY *v.* BETH ROSEN
## (SC 20950)

McDonald, D'Auria, Ecker, Alexander and Dannehy, Js.

### *Syllabus*

The plaintiff appealed from the judgment of the trial court, which had dismissed his defamation action against the defendant, and from the court's decision to award the defendant attorney's fees and costs pursuant to the anti-SLAPP statute (§ 52-196a). The plaintiff claimed, inter alia, that the trial court incorrectly concluded that he had failed to meet his burden under § 52-196a (e) (3) of showing that there was probable cause that he would prevail on the merits of his defamation per se claim, which was based on the defendant's statement on a social media page characterizing the plaintiff as a white supremacist. *Held*:

The trial court properly granted the defendant's special motion to dismiss the plaintiff's defamation action under § 52-196a.

The plaintiff expressly waived any challenge to the trial court's determination that the defendant had met her initial burden under § 52-196a (e) (3) of establishing, by a preponderance of the evidence, that the plaintiff's complaint implicated the defendant's exercise of her constitutional right of free speech on a matter of public concern.

The trial court correctly determined that the plaintiff had failed to satisfy his burden of demonstrating that there was probable cause that he would prevail on the merits of his defamation claim, this court having concluded that the characterization of someone as a white supremacist, without more, is a nonactionable opinion rather than actionable defamation per se.

Characterizing a person as a white supremacist, without more, is not a fact that can be objectively verified, the use of that term, without more, does not necessarily imply that the declarant knew existing, undisclosed defamatory facts, and, in the present case, given the context in which the defendant called the plaintiff a white supremacist, a reasonable reader of the comment would not have expected that the defendant was stating a fact about the plaintiff or that the defendant had private, firsthand knowledge supporting her characterization of the plaintiff.

The trial court did not abuse its discretion in awarding the defendant attorney's fees and costs under § 52-196a (f) (1).

Argued September 25, 2024—officially released January 21, 2025

*Procedural History*

Action to recover damages for defamation, and for other relief, brought to the Superior Court in the judicial district of Waterbury, where the court, *Gordon, J.*, granted the defendant's special motion to dismiss and rendered judgment thereon, from which the plaintiff appealed; thereafter, the court, *Gordon, J.*, granted the defendant's motion for attorney's fees, and the plaintiff filed an amended appeal. *Affirmed.*

*Edward Bona*, for the appellant (plaintiff).

*Anthony R. Minchella*, for the appellee (defendant).

*Opinion*

McDONALD, J. The use of derogatory remarks on social media and elsewhere has become commonplace in political discourse, with words and phrases taking on different meanings depending on the context in which the expression is made, the intentions of the speaker, and the viewpoint of the audience. This case arises out of heated political dialogue that took place on a town's social media page. The plaintiff, Sean Murphy, appeals from the judgment of the trial court, which granted the special motion to dismiss filed by the defendant, Beth Rosen, pursuant to Connecticut's anti-SLAPP[1] statute. See General Statutes § 52-196a. The trial court determined, as a matter of law, that the statements made by the defendant labeling the plaintiff as a "white supremacist" were nonactionable opinions. Therefore, the court concluded that the plaintiff had failed to satisfy his burden of showing that there was probable cause that he would succeed on the merits of his defamation per se claim, as required by § 52-196a (e) (3).

_____

[1] "SLAPP is an acronym for strategic lawsuit against public participation . . . ." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, 336 Conn. 332, 337 n.4, 246 A.3d 429 (2020), cert. denied,      U.S.      , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021).

The primary issue on appeal is whether the character-ization of the plaintiff as a "white supremacist" is, stand-ing alone, an actionable fact constituting defamation per se. We conclude that, although calling someone a "white supremacist" or a "racist" is a serious accusa-tion, the meanings of these terms are inherently subjec-tive. As a result, we join numerous other jurisdictions that have concluded that these terms are not objectively verifiable and do not, without more, imply the existence of undisclosed defamatory facts. Because the trial court correctly determined that the defendant's allegedly defam-atory statements constituted nonactionable opinions, we affirm the judgment of dismissal.

The record, viewed in the light most favorable to the plaintiff, reveals the following relevant facts and procedural history. In 2020, Jeff Manville, the first selectman of the town of Southbury, Edward B. St. John, the first selectman of the town of Middlebury, and Joshua Smith, the superintendent of the Southbury and Middlebury school system, posted a joint statement on Southbury's Facebook page. The statement was writ-ten in response to the killing of George Floyd.[2] Several community members, who are not parties to this litiga-tion, expressed disappointment with the content of the statement via comments on the post. Certain commu-nity members claimed that the message in the statement was that "All Lives Matter" instead of that "Black Lives Matter." This led to a heated debate among community members in the comments section of the post. Many of the comments were stridently political and emotionally charged.[3] Throughout the ensuing dialogue, the plaintiff

[2] Floyd was a Black man who was killed by a white police officer in 2020, sparking protests against police brutality and racial injustice across the United States. See, e.g., N. Byfield, Essay, "Blackness and Existential Crimes in the Modern Racial State," 53 Conn. L. Rev. 619, 640–41 (2021).

[3] For example, in response to a community member's comment, one com-menter stated: "[Y]ou can stop being racist now. It just shows [that] [S]outh-bury [is] full of a bunch of racist people. You think every [B]lack [person] acts like thugs and criminals? You think they all are lazy? You are really

and the defendant separately responded to other community members' comments. Eventually, another member of the public, who is not a party to this litigation, posted that the member's "daughters have had people call them the [N-word]" and advocated for community change. The plaintiff responded to that member, stating: "Provide names, dates, and location of the behavior please." The member replied: "[A]nd you are?" When the member refused to provide details, the plaintiff posted: "Again, names, times, and location of racial slurs. You went into a PUBLIC FORUM and made accusations of racism. I asked for you to name people who are doing it. You deflect and refuse to answer the question. You then call this harassment. You have no understanding of the word. Since you refuse to document your accusations, I am calling your comment BS." In response to the "and you are" question directed to the plaintiff, the defendant commented, "[the plaintiff is] a troll and a [w]hite [s]upremacist."

The plaintiff responded: "So now I am a [w]hite [s]upremacist? How is that? I want specifics. This is exactly what I mean by the behavior of you nasty hate filled Democrats. You make up whatever you have to.

---

[closed-minded] and heartless. Go praise your hero [President Donald J.] Trump who [is tear-gassing] innocent peaceful protesters. Guess I'm a thug too because I peacefully protest and support [B]lack people."

Another commenter argued: "[Y]ou have to be BLIND to read some of the comments under this post and believe that there aren't racists in our town. 'Systematic inequality isn't real.' 'White Lives Matter.' And on top of that not only is there racism but there is also anti-[S]emitism, xenophobia, and bigotry in our town and it doesn't take much to see it."

Yet another commenter contended: "[D]o you really believe that if a person believes that '[s]ystematic inequality isn't real' in the United States that makes them a racist? Please define what racist means to you. It seems that with liberals that term is quite fluid." That same commenter questioned: "[W]hy do Black lives matter right now? What is special about right now?" In response to an earlier comment, the commenter also noted, "[y]our ignorance is only surpassed by your bigotry."

At one point, the plaintiff asserted, "our little snowflake here is a disturbing representation of what is wrong with our education system."

PS, I am half Jewish. Wikipedia definition. White supremacy or white supremacism is the racist belief that white people are superior to people of other races and therefore should be dominant over them. I can say for sure that I have many friends who are [B]lack and Latino (including my adopted mother and brother) who are better human beings than you ever will be." The defendant replied to the plaintiff's post, stating: "[T]he burden of proof that you are not a [w]hite [s]upremacist is on you. I've seen many examples, especially during the election season. Feel free to prove otherwise."

The plaintiff thereafter filed the present action, alleging that the defendant's comments labeling him as a white supremacist constituted defamation per se. The defendant filed a special motion to dismiss pursuant to § 52-196a, arguing that the plaintiff's complaint was based on the defendant's exercise of her constitutional rights of free speech and association in connection with a matter of public concern. The parties stipulated to certain facts and that the defendant had satisfied her initial burden under § 52-196a (e) (3) to show, "by a preponderance of the evidence, that the opposing party's complaint . . . is based on the moving party's exercise of its right of free speech . . . [and] right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern . . . ." The trial court noted that, in deciding whether to grant a special motion to dismiss under § 52-196a (e) (3), Connecticut trial courts must undertake a two-pronged, burden shifting analysis.[4] Given the parties' stipulation that the defendant

---

[4] First, to satisfy her initial burden under § 52-196a (e) (3), the defendant "must show, by a preponderance of the evidence, that the exercise of [her rights of free speech and association was] in connection with a 'matter of public concern,' as defined in § 52-196a (a) (1)." *Robinson* v. *V. D.*, 346 Conn. 1002, 1008–1009, 293 A.3d 345 (2023). Second, if the defendant satisfies her initial burden, the burden then shifts to the plaintiff to "[set] forth with particularity the circumstances giving rise to the complaint . . . and [to demonstrate] to the court that there is probable cause, considering all valid

satisfied her initial burden under § 52-196a (e) (3), the trial court had only one question before it: Did the plaintiff establish that there was probable cause, considering all valid defenses, that he would prevail on the merits of his complaint by proving that the defendant's statements were actionable defamation per se? See General Statutes § 52-196a (e) (3).

After holding a hearing, the trial court granted the defendant's special motion to dismiss, reasoning that the plaintiff had failed to demonstrate that he would succeed on the merits of his defamation claim because the defendant's statements were nonactionable opinions. The plaintiff thereafter filed a motion for reconsideration, which the court denied. Pursuant to § 52-196a (f) (1), the defendant filed a motion for attorney's fees and costs, including fees and costs associated with the special motion to dismiss, as well as supporting affidavits. The court granted the motion, awarding the defendant fees and costs totaling $38,023.63.

The plaintiff appealed from the trial court's judgment of dismissal and decision granting the defendant's motion for attorney's fees to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Additional facts will be set forth as necessary.

On appeal, the plaintiff claims that the trial court improperly granted the defendant's special motion to dismiss. The plaintiff raises three specific arguments with respect to his challenge to the trial court's judgment of dismissal. First, the plaintiff asserts that the trial court incorrectly determined that the defendant had met her burden under § 52-196a (e) (3) of proving that the plaintiff's complaint was based on the defendant's exercise of her rights of free speech and associa-

defenses, that [he] will prevail on the merits of the complaint . . . .'' General Statutes § 52-196a (e) (3).

tion in connection with a matter of public concern. Second, the plaintiff argues that the trial court incorrectly determined that he had failed to demonstrate that there was probable cause, considering all valid defenses, that he would prevail on the merits of his defamation per se claim. The plaintiff also claims that the trial court abused its discretion in denying his motion for reconsideration. Lastly, the plaintiff contends that the trial court abused its discretion in granting the defendant's postjudgment motion for attorney's fees. We address each claim in turn.

I

Although the plaintiff's appellate brief is not a model of clarity, in certain parts of his brief, the plaintiff appears to contend that the defendant failed to satisfy her initial burden under § 52-196a (e) (3) of establishing that the plaintiff's complaint was based on the defendant's exercise of her constitutional right of free speech in connection with a matter of public concern.[5] The defendant disagrees and contends, among other things, that the plaintiff's claim is unreviewable because he waived this claim before the trial court. We agree with the defendant.

---

[5] The plaintiff raises a new claim that he is entitled to redress because the posting on Southbury's Facebook page is analogous to slandering the title to land pursuant to General Statutes § 47-33j. We decline to address this claim, as it was not raised before the trial court and, therefore, was not preserved for review. See, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 264–66, 828 A.2d 64 (2003). For us "[t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge. . . . We have repeatedly indicated our disfavor with the failure, whether because of a mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, with the assignment of such errors as grounds of appeal." (Citation omitted; internal quotation marks omitted.) *Simmons* v. *Simmons*, 244 Conn. 158, 187, 708 A.2d 949 (1998).

"Waiver is the voluntary relinquishment of a known right. . . . To determine whether a party has waived an issue, the court will look to the conduct of the parties." (Citations omitted.) *State* v. *Miranda*, 327 Conn. 451, 461, 174 A.3d 770 (2018). "When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." (Internal quotation marks omitted.) *State* v. *Foster*, 293 Conn. 327, 337, 977 A.2d 199 (2009). Similarly, when a party expresses satisfaction with a decision, allowing the party to appeal the decision would effectively ambush the trial court. See, e.g., *State* v. *Fabricatore*, 281 Conn. 469, 480–81, 915 A.2d 872 (2007).

In the present case, the plaintiff stipulated that the defendant had met her initial burden under § 52-196a (e) (3) of establishing that the plaintiff's complaint was based on the defendant's exercise of her right of free speech on a matter of public concern. Specifically, the trial court conducted a hearing regarding the special motion to dismiss that spanned two days. On the first day, the court stated: "So, if I'm understanding correctly, if my notes [are] accurate—accurately reflect where we currently stand, there's been a stipulation that [the defendant] has in fact made an initial showing by a preponderance of the evidence that [the plaintiff's] complaint against her is based on her exercise of her right of free speech. I assume it's free speech. I don't think it's a right to petition the government. Perhaps it's a right of association under the constitution of the United States or of the state of Connecticut in connection with a matter of public concern, is—is that correct?" Both the plaintiff's counsel and the defendant's counsel responded, "[y]es, Your Honor." The plaintiff's counsel also did not object to the court's characterization of the case when the court reiterated that the defendant had satisfied her initial burden and that the burden

now shifted to the plaintiff "to set forth with particularity the circumstances giving rise to his complaint and to demonstrate that there's probable cause, considering all valid defenses, that he will prevail on the merits of his complaint." See General Statutes § 52-196a (e) (3). Further, during his direct examination of the defendant, the plaintiff's counsel acknowledged that the post regarding Floyd was "a thing of public concern . . . ." Lastly, in the plaintiff's posthearing memorandum, he again stipulated that the defendant had met her initial burden and stated that "the only remaining issues for [the trial] court's consideration [were] whether . . . the plaintiff has set forth with particularity the circumstances giving rise to the complaint and whether the plaintiff has demonstrated probable cause that he will ultimately prevail."

In sum, the plaintiff or his counsel expressly agreed on three occasions that the defendant made the required preliminary showing under § 52-196a (e) (3). Not only did the plaintiff fail to argue before the trial court that the defendant did not satisfy her initial burden, he also affirmatively stipulated that she had done so. Therefore, we conclude that the plaintiff expressly waived any claim that the trial court incorrectly determined that the defendant met her initial burden under § 52-196a (e) (3).

## II

The plaintiff next asserts that the trial court incorrectly determined that the term "white supremacist" constitutes nonactionable opinion, rather than defamation per se. The plaintiff argues that the term "white supremacist" is defamation per se because it is a fact capable of being proven true or false or implied that the defendant knew existing, undisclosed defamatory facts about the plaintiff. To be clear, the plaintiff's claim on appeal is limited to whether the term "white suprem-

acist," by itself, always implies the existence of undisclosed defamatory facts. See footnote 9 of this opinion. The plaintiff also contends that the trial court abused its discretion in denying his motion for reconsideration.[6] In response, the defendant contends that the court correctly determined, as a matter of law, that her statements were nonactionable opinions when considered in their overall context. We agree with the defendant.

The question of whether the term "white supremacist" constitutes defamation per se is a question of law over which we exercise plenary review. See, e.g., *Net-Scout Systems, Inc.* v. *Gartner, Inc.*, 334 Conn. 396, 417, 429, 223 A.3d 37 (2020).

Our consideration of the plaintiff's challenge to the trial court's decision is informed by the following general principles. "At common law, [t]o establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." (Internal quotation marks omitted.) Id., 410. "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . ." (Internal quotation marks omitted.) *Gleason* v. *Smolinski*, 319 Conn. 394, 431, 125 A.3d 920 (2015).

"Defamation is comprised of the torts of libel and slander: slander is oral defamation and libel is written

---

[6] "We review the adjudication of a motion to reargue and reconsider for an abuse of discretion . . . ." (Citation omitted.) *Klass* v. *Liberty Mutual Ins. Co.*, 341 Conn. 735, 740–41, 267 A.3d 847 (2022). For the reasons set forth in part II of this opinion, the trial court properly identified and accurately applied the principles of defamation law. Therefore, we conclude that the trial court did not abuse its discretion by denying the plaintiff's motion for reconsideration.

defamation." (Internal quotation marks omitted.) Id., 430 n.30. For written defamation, a plaintiff can bring a "libel per se" or a "libel per quod" action. *Battista* v. *United Illuminating Co.*, 10 Conn. App. 486, 491, 523 A.2d 1356, cert. denied, 204 Conn. 802, 525 A.2d 1352 (1987), and cert. denied, 204 Conn. 803, 525 A.2d 1352 (1987). "[Although] all libel was once actionable without proof of special damages, a distinction arose between libel per se and libel per quod. . . . A libel per quod is not libelous on the face of the communication, but becomes libelous in light of extrinsic facts known by the recipient of the communication. . . . When a plaintiff brings an action in libel per quod, he must plead and prove actual damages in order to recover." (Internal quotation marks omitted.) *Stevens* v. *Khalily*, 220 Conn. App. 634, 646, 298 A.3d 1254, cert. denied, 348 Conn. 915, 303 A.3d 260 (2023). "Libel per se, on the other hand, is a libel the defamatory meaning of which is apparent on the face of the statement and is actionable without proof of actual damages. . . . When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it." (Internal quotation marks omitted.) Id.

In the present case, whether the trial court properly granted the defendant's special motion to dismiss turns on whether the term "white supremacist" conveys an objective fact or whether it is a nonactionable opinion. An understanding of a recent decision from this court is helpful to that analysis. In *NetScout*, the plaintiff, a technology company, alleged that the defendant's published vendor ratings and other statements about it in a market research report were false and defamatory statements. See *NetScout Systems, Inc.* v. *Gartner, Inc.*, supra, 334 Conn. 398–99, 405. The defendant filed a motion for summary judgment, which the trial court granted. See id., 406. We affirmed that decision on the

ground that the statements in the report were nonactionable opinions. See id., 408, 430–31. Even though the defendant in the present case filed an anti-SLAPP special motion to dismiss rather than a motion for summary judgment, we find *NetScout* instructive insofar as it illuminates the nuances that distinguish actionable statements of fact from nonactionable opinions in the defamation context, and it is therefore foundational to our analysis in the present case.

In *NetScout*, we emphasized that "it is not enough that the [allegedly defamatory] statement inflicts reputational harm. To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." (Internal quotation marks omitted.) Id., 410. "A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known. . . . In a libel action, such statements of fact usually concern a person's conduct or character. . . . An opinion, on the other hand, is a personal *comment* about another's conduct, qualifications or character that has some basis in fact." (Emphasis in original; internal quotation marks omitted.) Id., 411, quoting *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 111, 448 A.2d 1317 (1982). We noted that it is, of course, unsurprising that the dividing line between fact and opinion can often be difficult to draw. *NetScout Systems, Inc.* v. *Gartner, Inc.*, supra, 334 Conn. 411. This is especially so when a statement appears to be an opinion but is ambiguous because it can be reasonably understood by the reader to imply the existence of undisclosed facts. Id., 411–12; see also, e.g., *Goodrich* v. *Waterbury Republican-American, Inc.*, supra, 118 ("an opinion must be based [on] facts . . . [and] if the facts are neither known nor stated, then a defamatory opinion implies that there are undisclosed defamatory facts which justify the opin-

ion"). We clarified that, although an ambiguous statement can sometimes be reasonably understood to convey an implied actionable fact; see *NetScout Systems, Inc.* v. *Gartner, Inc.*, supra, 428; other times, vague and ambiguous statements cannot be "understood by a reasonable juror to imply a factual statement; their ambiguity does not invite the listener to infer a latent factual assertion but, rather, suggests an imprecise and irreducibly subjective meaning that cannot be understood to convey a statement of fact. Thus, the statements are expressions of opinion as a matter of law." Id., 429.

We further explained that, when evaluating whether an ambiguous statement implies defamatory facts or, rather, is merely a statement of opinion, the context in which the statement is made is critical. See id., 412. As this court has previously recognized, "[t]his distinction between fact and opinion cannot be made in a vacuum . . . for although an opinion may appear to be in the form of a factual statement, it remains an opinion if it is clear from the *context* that the [declarant] is not intending to assert another objective fact but only his personal comment on the facts which he has stated." (Emphasis in original; internal quotation marks omitted.) Id. To analyze the context of a statement, courts generally consider "(1) whether the circumstances in which the statement is made should cause the audience to expect an evaluative or objective meaning; (2) whether the nature and tenor of the actual language used by the declarant suggest a statement of evaluative opinion or objective fact; and (3) whether the statement is subject to objective verification." Id., 414.

Although we have not had occasion to consider whether the characterization of someone as a "white supremacist" is an actionable fact, other jurisdictions have determined that terms like "white supremacist" or "racist," standing alone, are nonactionable opinions because

they lack a precise meaning in our society. See, e.g., *Olthaus* v. *Niesen*, 232 N.E.3d 932, 940 (Ohio App. 2023) (concluding that term " 'white supremacist' " cannot be reasonably understood to convey statement of fact because it lacks precise meaning, cannot be plausibly verified, and is "[an] inherently value-laden" label that produces variety of highly emotional and subjective responses that will differ from reader to reader); *Keisel* v. *Westbrook*, 542 P.3d 536, 550 (Utah App. 2023) (calling someone "racist" or attributing racist statements to that person is nonactionable opinion insofar as "a certain set of facts might be viewed as racially insensitive by one group of people who share the same political or social views, but another group might view it as noncontroversial and socially acceptable, [and, as a result] a court is not in a position to give its imprimatur to one view or the other precisely because the phraseology used is one of opinion . . . not capable of being proven true or false" (internal quotation marks omitted)), cert. denied, 554 P.3d 1097 (Utah 2024); see also, e.g., *Law Offices of David Freydin, P.C.* v. *Chamara*, 24 F.4th 1122, 1131 (7th Cir. 2022) (characterizations of someone as " 'racist,' " " 'chauvinist,' " and " 'hypocrite,' " standing alone, were nonactionable statements of opinion because "comments of this nature [are] actionable when based on identifiable conduct but [are nonactionable] when stated in general terms, without asserting specific factual support"). Indeed, the plaintiff has not identified, and we have not found, a single case in which an appellate court has determined that the term "white supremacist," standing alone, is an actionable statement of fact.[7]

---

[7] A small number of courts around the country have declined to dismiss defamation claims involving racial epithets, but those cases involved special considerations not present in this case. See, e.g., *Zimmerman* v. *Buttigieg*, 576 F. Supp. 3d 1082, 1098 (M.D. Fla. 2021) (opining that it was inappropriate to dismiss defamation action prior to discovery "because it [was] not clear whether all the facts on which the statements [were] based [were] known to the public"); *Brimelow* v. *New York Times Co.*, Docket No. 20 Civ. 222 (KPF), 2020 WL 7405261, *6 (S.D.N.Y. December 16, 2020) (characterizing someone as "an 'open white nationalist' " implies self-identification, which

Recently, the New Hampshire Supreme Court grappled with this issue. We find that court's reasoning particularly persuasive. In *Richards* v. *Union Leader Corp.*, 324 A.3d 908 (N.H. 2024), the plaintiff claimed that the defendant author's statement accusing the plaintiff of "disseminat[ing], across multiple media platforms, white supremacist ideology" was defamatory because the term "white supremacist" has an accepted meaning capable of being proven true or false and because the statement implied undisclosed defamatory facts. (Internal quotation marks omitted.) Id., 913–14. The statement at issue was made in an op-ed piece and was based on the plaintiff's public testimony in support of legislation that would have prohibited schools from teaching critical race theory to children. See id., 911. The New Hampshire Supreme Court concluded that the statement did not imply that the plaintiff engaged in specific wrongful conduct and instead was a reference "generally about ideology the [op-ed's] author considers to be 'white supremacist'— ideology which the author believes the plaintiff supports." Id., 916. Additionally, the court reasoned that "whether a statement espouses white supremacist ideology is a matter of [sociopolitical] opinion that differs between individuals." (Internal quotation marks omitted.) Id. Therefore, the court concluded, the characterization of someone's ideology as " 'white supremacist' " is incapable of being objectively verified. Id.

We agree that characterizing someone as a "white supremacist," without more, is a matter of personal

is verifiable fact about that person), aff'd, Docket No. 21-66-cv, 2021 WL 4901969 (2d Cir. October 21, 2021), cert. denied,      U.S.    , 142 S. Ct. 1210, 212 L. Ed. 2d 217 (2022); see also, e.g., *Gibson Bros.*, *Inc.* v. *Oberlin College*, 187 N.E.3d 629, 644 (Ohio App.) (observing that statements that refer to history or pattern of discrimination and racial profiling "can be verified as true or false by determining whether there is, in fact, a history or account of racial profiling or discriminatory events"), appeal denied, 167 Ohio St. 3d 1497, 193 N.E.3d 575 (2022).

opinion rather than a fact that can be verified by this court. See, e.g., *Cousins* v. *Goodier*, 283 A.3d 1140, 1157–58 (Del. 2022) ("It cannot be denied [that the United States] is in the midst of an ongoing national debate about what it means to be racist. . . . It is not our role . . . to enter into this debate and decide who is right and who is wrong." (Footnotes omitted.)). Simply put, there is a lack of specificity and factual content in the naked term "white supremacist," which results in the term being a statement of opinion. See, e.g., *Petro-Lubricant Testing Laboratories, Inc.* v. *Adelman*, 233 N.J. 236, 258, 184 A.3d 457 (2018) ("[r]easonable people may disagree about the scope of a white supremacist's belief system").

Illustrating this lack of specificity are the differing definitions of "white supremacist" that the parties endorse. Prior to characterizing the plaintiff as a "white supremacist," the defendant posted her definition of the term as the "fear . . . that by including . . . others you will lose your privilege as a white Christian conservative male. That's what [w]hite [s]upremacy is all about. In reality, there can be room for all of us to be equal, but since we live in a patriarchal, misogynist society it's better for you not to have everyone included for fear that equality for all will take away your power." In her brief to this court, the defendant does not rely on a specific definition of "white supremacist," instead asserting that her definition is "malleable . . . ." Similarly, at the hearing before the trial court, the defendant rejected a dictionary definition of "white supremacist" that was proposed by the plaintiff's attorney "[b]ecause white supremacy and white privilege are . . . everchanging in their definition[s], especially . . . [in light of] how our society is changing and . . . how marginalized people have [been] oppressed. And it happens because of inequality, not just for race reasons." The plaintiff, on the other hand, relies on a dictionary and

asserts that the definition of "white supremacist" is: (1) "One who believes that white people are racially superior to others and should therefore dominate society"; (2) "[a]n advocate of white supremacy, a person who believes that the white race is inherently superior to other races and that white people should have control over people of other races"; or (3) "a person who believes that the white race is or should be supreme." (Internal quotation marks omitted.) Given the differing, subjective definitions, and the persuasive precedent from other jurisdictions, we conclude that the defendant's statements were nonactionable opinions because characterizing someone as a "white supremacist" in this context cannot be objectively verified.

The context in which the defendant called the plaintiff a "white supremacist" in the present case further demonstrates the point. See *NetScout Systems, Inc.* v. *Gartner, Inc.*, supra, 334 Conn. 414. The epithet was used during a heated episode of back-and-forth name-calling between the parties, in the midst of a skirmish involving sometimes derogatory language used by other community members commenting on the Facebook post. Each side accused the other of being racist. Indeed, prior to being called a "white supremacist," the plaintiff himself attacked the defendant's viewpoint, labeling one of her comments as "racist and bigoted . . . ."[8] The defendant has not filed a counterclaim alleging that the plaintiff's own statement was defamatory, but the resort to allegations of racism by both parties reveals a scenario in which some angry adults resort to an all too familiar vocabulary of personal invective and rude insults that are unaccompanied by facts. See, e.g., *Stevens* v. *Tillman*, 855 F.2d 394, 401–402 (7th Cir. 1988) (accusations of " 'racism' " are common

---

[8] The plaintiff also accused the defendant of supporting child abuse on the basis of the defendant's work with the gender nonconforming equality movement.

in political discourse, and term " 'racist' " is "loosely" used in that context and amounts to " 'mere name-calling' "), cert. denied, 489 U.S. 1065, 109 S. Ct. 1339, 103 L. Ed. 2d 809 (1989). Under these circumstances, a reasonable reader would not have expected the defendant to be stating a fact about the plaintiff.

Upon analysis as to "the nature and tenor" of both parties' Facebook comments, we find that there is no suggestion that either party was asserting objective facts about the other. *NetScout Systems, Inc.* v. *Gartner, Inc.*, supra, 334 Conn. 414. The nature of the defendant's characterization of the plaintiff as a "white supremacist" is informed by her use of the word "troll" as part of the first insulting statement. In this context, "troll" is generally regarded as a slang term that refers to "a person who intentionally antagonizes others online by posting inflammatory, irrelevant, or offensive comments or other disruptive content." Merriam-Webster Online Dictionary, available at https://www.merriamwebster.com/dictionary/troll (last visited January 17, 2025). The inclusion of the hyperbolic word "troll" further signaled to readers that the defendant was not stating an objective fact but, rather, was engaging in "mere name-calling . . . ." (Internal quotation marks omitted.) *Stevens* v. *Tillman*, supra, 855 F.2d 401.

Finally, as we already explained, we agree with, and join, the jurisdictions that have concluded that the bald characterization of someone as a "white supremacist," without more, is ordinarily not a statement of fact susceptible of objective verification. This consideration supports the conclusion that a reader would not have determined that the defendant's statements asserted a fact, given their context. See *NetScout Systems, Inc.* v. *Gartner, Inc.*, supra, 334 Conn. 414; see also, e.g., *Richards* v. *Union Leader Corp.*, supra, 324 A.3d 915–16.

Nevertheless, the plaintiff contends that he met his burden under § 52-196a (e) (3) of showing that there was probable cause that he would prevail on the merits of his complaint because the term "white supremacist" implies that the defendant had knowledge of certain undisclosed facts.[9] Specifically, he asserts that the term "white supremacist," in and of itself, always implies undisclosed facts by insinuating that the plaintiff is someone who advocates for racial superiority and racially motivated criminal acts. Although the plaintiff correctly notes that a statement that implies undisclosed facts may amount to a defamatory statement, we disagree with the notion that the term "white supremacist" necessarily implies knowledge of undisclosed facts. The term's inherent lack of specificity and factual content is largely what makes it an opinion. See, e.g., *Petro-Lubricant Testing Laboratories, Inc.* v. *Adelman*, supra, 233 N.J. 258. Simply calling someone a "white supremacist," without more, can convey a broad array of meanings in our society depending on the context in which the words are expressed and, therefore, does not always imply the existence of undisclosed facts.

Moreover, we are not persuaded that, in this case, a reasonable fact finder would believe that the defendant had private, firsthand knowledge supporting her char-

[9] Before the trial court, the plaintiff asserted that the defendant's entire second statement—"[T]he burden of proof that you are not a white supremacist is on you. *I've seen many examples*, especially during the election season. Feel free to prove otherwise."—implied to the reader that the defendant knew additional defamatory facts that would validate her claim that the plaintiff is a white supremacist. (Emphasis added.) The plaintiff did not advance this argument in his appellate brief or during oral argument before this court. Instead, before this court, the plaintiff abandoned this more nuanced argument in favor of the broad contention that the term "white supremacist," by itself, *always* implies the existence of certain undisclosed facts. Accordingly, we consider any argument related to the rest of the statement abandoned and decline to address it. See, e.g., *Samelko* v. *Kingstone Ins. Co.*, 329 Conn. 249, 255 n.3, 184 A.3d 741 (2018).

acterization of the plaintiff. See, e.g., *NetScout Systems, Inc.* v. *Gartner, Inc.*, supra, 334 Conn. 416–17. Indeed, in the present case, the plaintiff points to no evidence by which a reasonable fact finder could conclude that the defendant knew the plaintiff personally, let alone that the defendant had inside knowledge about the plaintiff. The defendant explained in her affidavit and hearing testimony that she accused the plaintiff of being a "white supremacist" because of his comments on the Facebook post. See, e.g., *Williams* v. *Lazer*, 137 Nev. 437, 440–41, 495 P.3d 93 (2021) (reviewing statement at issue and sworn declaration of defendant in determining whether statement was nonactionable opinion). Any member of the Southbury Facebook group was free to view the publicly available comments that the plaintiff posted, in the context of the roughly forty-six pages of comments that included numerous instances of name-calling, and form his or her own opinion as to whether he or she agreed or disagreed with the defendant's characterization of the plaintiff. See, e.g., *Weidlich* v. *Rung*, Docket No. M2017-00045-COA-R3-CV, 2017 WL 4862068, *1, *6–7 (Tenn. App. October 26, 2017) (posting photograph on social media of bumper stickers on plaintiff's vehicle, along with statement characterizing plaintiff and his family as " 'white supremacist[s],' " constituted nonactionable opinion and did not imply undisclosed defamatory facts because photograph was available to all who viewed statement).

Further, the definition of "white supremacist" that the defendant provided to readers of the Facebook post did not implicate the connotations that the plaintiff alleges before this court.[10] The defendant explained that

---

[10] Before characterizing the plaintiff as a "white supremacist," the defendant stated the following on the Facebook post: "[I]ncluding others does not mean that white, [C]hristian, conservative males are excluded. Your fear is that by including the others you will lose your privilege as a white Christian conservative male. That's what [w]hite [s]upremacy is all about. In reality, there can be room for all of us to be equal, but since we live in a patriarchal, misogynist society it's better for you not to have everyone

her definition centered on social inequality and complex power dynamics across identities.[11] The defendant did not accuse the plaintiff of any specific instances of wrongful conduct that are commonly associated with hate groups. See, e.g., *La Liberte* v. *Reid*, 966 F.3d 79, 93 (2d Cir. 2020) ("accusation[s] of concrete, wrongful conduct are actionable [whereas] general statements charging a person with being racist, unfair, or unjust are not" (internal quotation marks omitted)). The defendant used the term to describe the sociopolitical views that she associated with the plaintiff's perceived identity as a "white Christian conservative male." Although her perception was by no means complimentary, it cannot be said that, by calling the plaintiff a "white supremacist," the defendant was alleging that he engages in illegal conduct.[12]

Therefore, we agree with the trial court's determination that the plaintiff did not sustain his burden of demonstrating that the defendant's statements necessarily imply the existence of undisclosed facts because

included for fear that equality for all will take away your power."

[11] On the Facebook post, the plaintiff provided what he claimed was the "Wikipedia definition" of "white supremacy": "White supremacy or white supremacism is the racist belief that white people are superior to people of other races and therefore should be dominant over them." It is clear from the defendant's comments, and her posted definition of "white supremacist"; see footnote 10 of this opinion; that the meaning she ascribed to the term was more nuanced than the plaintiff's definition.

[12] If the defendant had connected the plaintiff to a specific hate group instead of a general sociopolitical viewpoint, that statement may have been actionable under certain circumstances. See, e.g., *Lega Siciliana Social Club, Inc.* v. *St. Germaine*, 77 Conn. App. 846, 854–55, 825 A.2d 827 (statement connecting plaintiff to Mafia was libel per se because Mafia is generally known to participate in criminal activities), cert. denied, 267 Conn. 901, 838 A.2d 210 (2003); see also, e.g., *Forte* v. *Jones*, Docket No. 1:11-cv-0718-AWI-BAM, 2013 WL 1164929, *6 (E.D. Cal. March 20, 2013) (concluding that, although "the allegation of membership in the Ku Klux Klan" would be actionable, "the allegation that a person is a 'racist,' on the other hand," would not be actionable "because the term 'racist' has no [factually verifiable] meaning").

"the overall tone and tenor of the online debate, combined with the hyperbolic nature of the exchanges taking place between the plaintiff and the defendant specifically, negate [that] conclusion . . . ."

We again emphasize that this determination is context- and fact-specific. If the term was connected to the plaintiff's professional occupation or to specifically alleged activities, it might have been actionable under Connecticut defamation law. See, e.g., *Benvenuto* v. *Brookman*, 348 Conn. 609, 614 and n.3, 309 A.3d 292 (2024) (referencing trial court's determination that statements about plaintiff being racist in context of his professional capacity as police officer were defamatory per se); see also, e.g., *Garrard ex rel. R.C.G.* v. *Charleston County School District*, 439 S.C. 596, 598, 890 S.E.2d 567 (2023) (noting that, although general accusations of racism are nonactionable, term "racist" can be actionable when connected to specific instances (internal quotation marks omitted)). Reading the Facebook post and comments in their entirety and in context, however, we agree with the trial court that the language the defendant used is merely expressive rhetoric meant to convey her opinion of the plaintiff's political views, not an attempt to assert factual allegations related to the plaintiff's conduct or to imply undisclosed facts.

### III

Lastly, the plaintiff contends that the trial court's decision awarding the defendant attorney's fees was improper. On the basis of our examination of the record and the briefs, and our consideration of the arguments of the parties, we are persuaded that the decision of the trial court should be affirmed because the court did not abuse its discretion as to this issue. See, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 252, 828 A.2d 64 (2003) (applying abuse of discretion standard to amount of attorney's fees awarded and trial

court's determination of facts that justified award). The attorney's fees issue was resolved properly in the trial court's thorough and well reasoned memorandum of decision. Because that memorandum of decision fully addresses the attorney's fees issue, we need not repeat the discussion contained therein. See, e.g., *In re Application of Eberhart*, 267 Conn. 667, 668, 841 A.2d 217 (2004).

The judgment of dismissal and the decision granting the defendant's motion for attorney's fees are affirmed.

In this opinion the other justices concurred.